[No. S102249. Feb. 6, 2003.]

JACK A. GARDNER et al., Plaintiffs and Appellants, v.
COUNTY OF SONOMA, Defendant and Respondent.

## COUNSEL

Perry, Johnson, Murray, Anderson & Miller, Perry, Johnson, Murray, Anderson, Miller & Moskowitz, Leslie R. Perry and Jessica R. Flores for Plaintiffs and Appellants.

James S. Burling for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Craig J. Bassett for Richard van't Rood as Amicus Curiae on behalf of Plaintiffs and Appellants.

Steven M. Woodside, County Counsel, and Sue A. Gallagher, Deputy County Counsel, for Defendant and Respondent.

Stephen Shane Stark, County Counsel (Santa Barbara) and Alan L. Seltzer, Assistant County Counsel, for the County of Santa Barbara as Amicus Curiae on behalf of Defendant and Respondent.

McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., Robert E. Merritt and Geoffrey L. Robinson for the California State Association of Counties and Participating California Cities as Amici Curiae on behalf of Defendant and Respondent.

M. Thomas Jacobson for American Planning Association and the California Chapter of the American Panning Association as Amici Curiae on behalf of Defendant and Respondent.

Jonathan Wittwer for Granada Sanitary District as Amicus Curiae on behalf of Defendant and Respondent.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, and

Jamee Jordan Patterson, Deputy Attorney General, for California Coastal Commission as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**BAXTER, J.**—In the matter before us, an owner of property consisting of more than 1,000 acres in the County of Sonoma caused a subdivision map of his land to be recorded in 1865, prior to the earliest origins of California's Subdivision Map Act (hereafter sometimes the Map Act or the Act) (Gov. Code, § 66410 et seq.). The plaintiffs herein own approximately 158 acres of that land and seek to establish that their property consists of 12 lawfully subdivided parcels that may be sold, leased, or financed in compliance with the Act. As they see it, the 1865 subdivision map should be given legal recognition under the Act because: (1) the map was recorded and accurately described the property it depicted; and (2) an atlas adopted in 1877 as the "official map" of Sonoma County included the subdivision shown on the 1865 map. The property in question has remained intact under sequential owners throughout its history.

Our review of the Subdivision Map Act and the relevant case law leads us to conclude that the 1865 recordation of the subdivision map did not establish or create legally cognizable subdivisions for purposes of the Act, notwithstanding the map's claimed accuracy and its inclusion in the 1877 atlas. We therefore affirm the judgment of the Court of Appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

No party petitioned the Court of Appeal to suggest that its opinion omitted or misstated any material fact. (See Cal. Rules of Court, rule 28(c)(2).) Accordingly, the following is taken in large part from that court's recitation of facts.

In May of 1865, S.H. Greene recorded a map entitled "The Redwood Estate of S.H. Greene" with the Sonoma County Recorder. The map purported to depict a vast subdivision of Greene's property, consisting of nearly 90 rectangular lots in a grid superimposed over more than 1,000 acres of open land west of Sebastopol. The map divided the lots into four different ranges, with 15 to 28 lots per range. Each lot was labeled with a range number and a lot number, as well as length and width measurements, which appear to be precise to the one-hundredth of an acre.

The Greene map identified two streams flowing through the depicted subdivision, Salmon and Jonive Creeks, but no other geographic features. It

also reflected a county road running along the southeast corner of the grid, but showed no interior roads, easements, access routes, drainage systems, or other subdivision infrastructure.

No applicable subdivision map regulations existed in 1865.[1] Consequently, the Greene map was submitted and accepted for recordation without review or approval by any public entity. The Thompson Atlas of Sonoma County, adopted in 1877 as the "official map" of Sonoma County for township lines and other unspecified county purposes, showed a purported subdivision called "The Redwood Estate of S.H. Greene."

Over the years, numerous parts of the Greene property were conveyed to different parties. In 1903, the Greene family made a bulk conveyance of approximately 352 acres to Paul Bertoli, using the Greene map for reference but describing the conveyed property in detail, using metes and bounds.

In 1990, approximately 158 acres of the Bertoli conveyance came into the possession of Jack and Jocelyn Gardner, trustees of the Gardner Family Trust, and Lindsay and Hilary Gardner, collectively referred to as plaintiffs. Plaintiffs' property, located in the south-central area of the so-called Greene subdivision, bears little resemblance to the distinctive rectangular lots depicted on the map Greene recorded in 1865. Although plaintiffs' property includes two of the original rectangular lots in full, its balance consists of only fragments of 10 of the other original lots. The property, which currently is zoned by the County of Sonoma (the County) for "Resource and Rural Development" and 40-acre density, includes steep slopes and is the subject of a timber harvest plan.

In 1996, plaintiffs applied to the County's permit and resource management department for 12 certificates of compliance with the Subdivision Map Act, pursuant to section 66499.35 of the Government Code.[2] Such certificates would have established that the County recognized plaintiffs' property as consisting of 12 lawfully created parcels that could be sold, leased, or financed in compliance with the Act. (See § 66499.35, subd. (f)(1)(E).) The department denied plaintiffs' application, determining that the Greene map

---

[1]The first statute providing statewide authorization for the formal recordation of subdivision maps and city and town plats for purposes of lot sales was enacted in 1893. (Stats. 1893, ch. 80, pp. 96-97.) According to one treatise, earlier legislation had required mapping of subdivided public lands and private lands to be sold within certain cities and towns. (Curtin & Merritt, Cal. Subdivision Map Act and the Development Process (Cont.Ed.Bar 2d ed. 2001) History, Purpose, and Preemption, § 1.2, pp. 2-3 [citing as an example Stats. 1867-1868, ch. 331, concerning the subdivision of lands in San Francisco].) Here, however, none of the parties identifies any pre-1893 subdivision statute, ordinance, or regulation that might have any relevance to this case.

[2]All further statutory references are to this code unless otherwise indicated.

did not create legally cognizable parcels because it was recorded before 1893, the year the Legislature enacted the first subdivision map statute with statewide effect. The planning commission denied plaintiffs' appeal of the department's action, but authorized the department to issue one certificate of compliance recognizing the subject property as a single parcel.

Plaintiffs then appealed the commission's decision to the County Board of Supervisors. The board adopted a resolution upholding the commission's action, finding, as a factual matter, that: (1) plaintiffs' property had been "repeatedly and consistently conveyed as a single unit of land" since 1865 and "generally described in metes and bounds since 1903"; and (2) none of plaintiffs' 12 purported lots had ever been separately conveyed or separately described in a grant deed.

The resolution further concluded, as a legal matter, that "the creation of parcels by the recordation of a map is a legal consequence of the Subdivision Map Act and that therefore, only maps properly recorded under the Subdivision Map Act or certain of its predecessor statutes can be deemed to create parcels." Additionally, the resolution found that "the mere recordation of a map prior to 1893 cannot create parcels cognizable under the Subdivision Map Act." It also concluded that the Thompson Atlas of 1877 did not establish parcels within the meaning of the Act because the map had been adopted for "administrative purposes and served [only] as a reference tool for property descriptions and geographic locations." The resolution concluded by affirming the denial of plaintiffs' request for 12 certificates of compliance.

Plaintiffs filed a petition for writ of mandate in superior court to compel the County to issue 12 certificates of compliance for their Greene map lots. The superior court denied the petition, essentially ruling that the Greene map did not create legal parcels within the meaning of the Subdivision Map Act. The Court of Appeal affirmed, holding that the legislative intent underlying the Act precludes legal recognition of subdivision lots shown on antiquated subdivision maps recorded before 1893.[3]

We granted plaintiffs' petition for review.

DISCUSSION

The Subdivision Map Act is "the primary regulatory control" governing the subdivision of real property in California. (*Hill v. City of Clovis* (2000)

---

[3]As used in this opinion, an "antiquated map" refers to a subdivision map that was recorded before 1893.

80 Cal.App.4th 438, 445 [94 Cal.Rptr.2d 901].) The Act vests the "[r]egulation and control of the design and improvement of subdivisions" in the legislative bodies of local agencies,[4] which must promulgate ordinances on the subject. (§ 66411.) The Act generally requires all subdividers of property to design their subdivisions in conformity with applicable general and specific plans and to comply with all of the conditions of applicable local ordinances. (See *Hill v. City of Clovis, supra,* 80 Cal.App.4th at p. 445.)

As used in the Act, "subdivision" means "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease or financing, whether immediate or future." (§ 66424.) Ordinarily, subdivision under the Act may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved. (See *John Taft Corp. v. Advisory Agency* (1984) 161 Cal.App.3d 749, 755 [207 Cal.Rptr. 840] (*Taft*).) A local agency will approve a tentative and final map or a parcel map only after extensive review of the proposed subdivision and consideration of such matters as the property's suitability for development, the adequacy of roads, sewer, drainage, and other services, the preservation of agricultural lands and sensitive natural resources, and dedication issues. (See, e.g., §§ 66451-66451.7, 66452-66452.13, 66453-66472.1, 66473-66474.10, 66475-66478.)

■ By generally requiring local review and approval of all proposed subdivisions, the Act aims to "control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general." (*Hays v. Vanek* (1989) 217 Cal.App.3d 271, 289 [266 Cal.Rptr. 856] (*Hays*).) More specifically, the Act seeks "to encourage and facilitate

---

[4]The Act defines "design" as: "(1) street alignments, grades and widths; (2) drainage and sanitary facilities and utilities, including alignments and grades thereof; (3) location and size of all required easements and rights-of-way; (4) fire roads and firebreaks; (5) lot size and configuration; (6) traffic access; (7) grading; (8) land to be dedicated for park or recreational purposes; and (9) other specific physical requirements in the plan and configuration of the entire subdivision that are necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan . . . ." (§ 66418.)

"Improvement" refers to "any street work and utilities to be installed . . . by the subdivider on the land to be used for public or private streets, highways, ways, and easements, as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs *as a condition precedent to the approval and acceptance of the final map thereof.*" (§ 66419, subd. (a).) Improvement "also refers to any other specific improvements or types of improvements, the installation of which, either by the subdivider, by public agencies, by private utilities, by any other entity approved by the local agency, or by a combination thereof, is necessary to ensure" plan consistency. (*Id.,* subd. (b).)

"Local agency" refers to "a city, county or city and county." (§ 66420.)

orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93] (*Gomes*); see also *Hill v. City of Clovis, supra,* 80 Cal.App.4th at p. 445.)

As relevant here, the Act provides that any property owner may request a determination from the appropriate local agency as to whether his or her property complies with the Act and applicable local ordinances. (§ 66499.35, subd. (a).) If the property is found in compliance, the agency shall cause a certificate of compliance to be filed for record with the recorder of the county where the property is located. (*Ibid.*) When parcels are validated by certificates of compliance, they "may be sold, leased, or financed without further compliance with the Subdivision Map Act or any local ordinance enacted pursuant thereto." (§ 66499.35, subd. (f)(1)(E).) Conversely, if the property is found lacking in compliance, the local agency shall cause the filing of a conditional certificate of compliance, imposing conditions that the owner must fulfill. (*Id.,* subd. (b).)

For purposes of the Act, "[a] recorded final map, parcel map, official map, or an approved certificate of exception shall constitute a certificate of compliance with respect to the parcels of real property described therein." (§ 66499.35, subd. (d).) Here, however, no such map or approved certificate of exception has ever been filed or recorded for any of the property in question.

The map Greene recorded in 1865 is not a "final map" or a "parcel map," which are statutorily defined to include only those maps that have been reviewed and approved for recordation by a local agency under the provisions of the Map Act or a local ordinance adopted thereunder. (See §§ 66433-66443 [content and form of final maps], 66444-66450 [content and form of parcel maps], 66451-66451.7 [procedures for processing tentative, final, and parcel maps], 66456-66462.5 [final maps].)

Nor does the Greene map qualify as an "official map." (§ 66499.50 et seq.) Under the Act, an official map refers to a map of a city, town, or subdivision of land prepared by a city engineer or the county surveyor, "under the direction and with the approval of the city council or board of supervisors," or prepared by "any surveyor or engineer, under the review of the city engineer or county surveyor," pursuant to specific provisions of the Act. (§ 66499.52, subds. (a), (b).) That the Greene subdivision was reflected in the Thompson Atlas appears of no consequence. Although the County

Board of Supervisors apparently adopted that atlas in 1877 as the "official map" of Sonoma County, the record shows it did so for reference to township lines and other unspecified county purposes.[5] Plaintiffs have not attempted to establish that the atlas was prepared and adopted as an official map pursuant to the Act's specific provisions.

Finally, the Greene map is not a "certificate of exception" within the Act's contemplation. As statutorily defined, such certificates were authorized only between 1967 and 1972, and only in the County of Los Angeles. (See § 66422.)

■ In sum, the map Greene recorded in 1865 does not itself qualify as a certificate of compliance under the Act because it is not a "recorded final map, parcel map, official map, or an approved certificate of exception." (§ 66499.35, subd. (d).)

Plaintiffs argue, nonetheless, that the Map Act contains two "grandfather" provisions—section 66499.30, subdivision (d) and section 66451.10, subdivision (a)—that support legal recognition of the already subdivided nature of their property and compel the issuance of the 12 requested certificates of compliance. We address these provisions in order.[6]

To enforce its important public purposes, the Act generally prohibits the sale, lease, or financing of any parcel of a subdivision until the recordation of an approved map in full compliance with the law. (§ 66499.30, subds. (a), (b), (c).) Subdivision (d) of section 66499.30 (section 66499.30(d)) provides, however, that these prohibitions "do not apply to any parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased in compliance with or exempt from any law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established." In turn, section 66412.7 specifies that for purposes of this exception, a subdivision is deemed "established . . . on the date of recordation of the final map or parcel map, except that in the case of (1) maps filed for approval prior to March 4, 1972, and subsequently approved by the local agency or (2) subdivisions exempted from map requirements by a certificate of exception (or the equivalent) applied for prior to such date and subsequently issued by the local agency pursuant to local ordinance, the subdivision shall be deemed established on the date the map or application for a certificate of exception (or the equivalent) was filed with the local agency."

---

[5] The record, we note, contains no indication that the County ever treated plaintiffs' property as 12 separate parcels for purposes of assessing property taxes.

[6] Plaintiffs also make a passing reference to section 66412.6, but offer no analysis or argument supporting its application here. Accordingly, we refrain from addressing that provision on the ground it is not properly raised.

 Did the 1865 recordation of the Greene map establish a subdivision under the Act's provisions? (§ 66412.7.) The answer to this question is no. As earlier discussed, the Greene map is not a final map or a parcel map (see §§ 66433-66443, 66444-66450, 66451-66451.7, 66456-66462.5) and is not a certificate of exception (see § 66422).

Nor was the Greene map ever "filed for approval" or "subsequently approved" by a local agency as section 66412.7 contemplates. Because section 66499.30(d) recognizes only parcels or parcel sales that were made in compliance with or were exempt from the provisions of any law "regulating the design and improvement of subdivisions in effect at the time the subdivision was established," the logical inference is that section 66412.7's required approval for maps filed before March 4, 1972 must likewise be related to subdivision design and improvement. Reasonably read, sections 66499.30(d) and 66412.7 protect subdivisions that either already were approved by local agencies, or were deemed exempt under previous subdivision laws in effect at the time the subdivisions were established.

 Before 1893, however, there was no statewide mechanism generally authorizing local agencies to review or approve subdivision maps. And in 1865 there was no other subdivision statute, ordinance, or regulation specifically authorizing public agency approval of subdivisions in Sonoma County. Perhaps in light of these factual circumstances, plaintiffs rely on *Lakeview Meadows Ranch v. County of Santa Clara* (1994) 27 Cal.App.4th 593 [32 Cal.Rptr.2d 615] (*Lakeview*) to argue that section 66499.30(d)'s application to parcels that were "*exempt from any law . . .* regulating the design and improvement of subdivisions in effect at the time the subdivision was established" (italics added) includes application to parcels that were "not subject to" the provisions of any law regulating subdivisions at the time the subdivision was established. In other words, they contend, section 66499.30(d) should be construed to include subdivisions predating the enactment of any applicable subdivision law. (See *Lakeview, supra,* 27 Cal.App.4th at p. 599 [concluding that "exempt" and "not subject to" have essentially the same meaning].)

Even assuming, for sake of argument, that the statutory phrase "exempt from" may be construed to mean "not subject to," plaintiffs cannot demonstrate that recordation of the Greene map in 1865 lawfully "established" the claimed subdivision for purposes of section 66499.30(d).

As noted, the first California act providing statewide authorization for the formal recordation of subdivision maps and city and town plats for purposes of lot sales was enacted in 1893, long after the Greene map was recorded in

1865. (*Ante*, at fn. 1.) That early act established standards for mapping by requiring accuracy of maps, identification of public roads and common areas, and specification of each lot's precise length and width. (Stats. 1893, ch. 80, § 1, p. 96.) Owners were required to acknowledge subdivision maps and to file them in the county recorder's office prior to sale of the mapped lots. (*Id.*, §§ 2, 3, p. 96.) The act made it a misdemeanor for any person to "sell[], or offer[] for sale, any lot within any city, town, subdivision, or addition, before the map or plat thereof is made out, acknowledged, filed, as herein provided." (*Id.*, § 4, pp. 96-97.) Violators were subject to fines and imprisonment in the county jail (*ibid.*), and the act specified no exceptions.

Notably, however, no state or local legislation authorized the establishment or creation of subdivided parcels in Sonoma County by map recordation before 1893.[7] Although plaintiffs cite a number of judicial decisions for the proposition that subdivision maps recorded before 1893 resulted in the legal creation of parcels under the common law, those decisions merely recognized the principle that subdivision maps could properly supply the legal description of property conveyed by deed. (E.g., *McCullough v. Olds* (1895) 108 Cal. 529, 531-532 [41 P. 420]; *Cadwalader v. Nash* (1887) 73 Cal. 43, 45 [14 P. 385]; see also *Masterson v. Munro* (1895) 105 Cal. 431, 433-434 [38 P. 1106].)

 ██ ██ Contrary to plaintiffs' suggestions otherwise, case law indicates that, where an antiquated map was not recorded pursuant to any subdivision statute, ordinance, or regulation, a subdivided lot shown on that map generally enjoyed no independent legal status until the owner actually conveyed the lot separately from the surrounding lands through a deed or patent.[8] (See *Lakeview, supra*, 27 Cal.App.4th at pp. 596-598 [1891 federal patent that conveyed title to Southern Pacific Railroad created a parcel]; *Hays, supra*, 217 Cal.App.3d at p. 289 [grandfather provision of 1929 version of Act not applicable to later purchasers whose property had never been sold in subdivided form]; *Taft, supra*, 161 Cal.App.3d at pp. 756-757 [United States Survey Map filed in 1878 pursuant to federal law did not subdivide land for Subdivision Map Act purposes]; *People v. Byers* (1979) 90 Cal.App.3d 140, 149 [153 Cal.Rptr. 249] [subject lands found not to have

---

[7]Certain amici curiae in support of the County assert that only maps recorded under the 1929 predecessor to the Map Act or subsequent map statutes legally created parcels. (Stats. 1929, ch. 837, pp. 1790-1805; *Hays, supra*, 217 Cal.App.3d at p. 289.) Conversely, the California Attorney General has opined that maps recorded under earlier predecessor statutes to the Act should also be deemed to create parcels (74 Ops.Cal.Atty.Gen. 149 (1991)). We need not resolve that dispute in this case, for the map at issue here predates the earliest predecessor statute enacted in 1893.

[8]A patent is a deed of the United States, the conveyance by which title to portions of the public domain is passed. (*Gomes, supra*, 37 Cal.App.4th at p. 983.)

been subdivided in 1887 for purposes of the Subdivided Lands Act where a map recorded at the time referred to the land as a subdivision but the land was not in fact divided]; cf. 81 Ops.Cal.Atty.Gen. 144 (1998) [multiple contiguous lots on a federal survey map may not be separately conveyed without compliance with the Map Act]; *Colton L. & W. Co. v. Swartz* (1893) 99 Cal. 278, 285 [33 P. 878] ["[a] map is not an 'instrument' which affects the title or possession of real property," though a map "deposited within the recorder's office is properly referred to in [a deed] as being 'of record' therein"].) Thus, while antiquated maps served to facilitate land conveyances involving the properties they depicted, such maps generally could not alter the legal status of those properties without the attendant conveyances.[9]

Consequently, unlike a modern-day final map or parcel map, which upon recordation ordinarily converts what was formerly a single parcel into as many separate lots as appear on the map (see *County of Los Angeles v. Hartford Acc. & Indem. Co.* (1970) 3 Cal.App.3d 809, 813 [83 Cal.Rptr. 740]), the recordation of a subdivision map in Sonoma County in 1865, without something more (such as a conveyance), could not and did not work a legal subdivision of the property shown thereon, and property owners who recorded subdivision maps in Sonoma County in 1865 generally remained free to deed parcels and lots as they desired without regard to the depicted subdivisions.[10]

In short, plaintiffs cannot demonstrate that their claimed subdivision was established in 1865 by virtue of the Greene map. First, the map's recordation preceded the first statewide map legislation enacted in 1893, and plaintiffs

---

[9]A somewhat analogous rule of the common law posited that, prior to California's adoption of statutory methods of dedication, the mere filing and recordation of a subdivision map did not create a dedication to public use of property so depicted on the map, e.g., streets, highways, and parks, until there was action upon the dedication. (*Berton v. All Persons, etc.* (1917) 176 Cal. 610 [170 P. 151] [where landowner divided property into lots and sold them by descriptions running along the line of a street delineated on a recorded map, to which the various conveyances referred, he thereby offered a dedication of the street which was accepted by the public's use]; *Archer v. Salinas City* (1892) 93 Cal. 43 [28 P. 839] [where owner filed a map depicting a subdivision and a nearby open space as a park and advertised to lot purchasers that the open space was reserved for a park, and purchasers acted on such representations, a dedication of the park to the public use occurred]; *Wolfskill v. County of Los Angeles* (1890) 86 Cal. 405 [24 P. 1094] [the filing and recordation of a map is but an offer of dedication of the streets and highways thereon; the public authorities must have accepted the offer in some form for it to constitute a dedication of which they may take advantage]; *Haywood v. Manzer* (1886) 70 Cal. 476 [13 P. 141] [by filing and recording a map, property owner merely made an offer of dedication to the public of certain streets shown by the map; such offer could not become effectual as an irrevocable dedication to public use until its acceptance by the public].)

[10]Here, in fact, the Greene family later acted to reconfigure its land by deed without regard to the lot lines shown on the 1865 map. Moreover, as noted, 10 of the 12 parcels sought by plaintiffs are but mere fractions of the subdivided parcels shown on the map.

make no claim that the map was recorded pursuant to some other preexisting statute or regulation specifically governing the subdivision of property in Sonoma County. Second, it is undisputed that the property in question has remained intact under sequential owners throughout its history; consequently, plaintiffs cannot fit their case within the decisions recognizing the establishment of subdivisions by conveyance.

*Hays, supra,* 217 Cal.App.3d 271, which interpreted a grandfather provision in the 1929 version of the Subdivision Map Act,[11] supports this conclusion. After observing that "[t]he clear purpose of the so-called 'grandfather' clause is to protect developers who have detrimentally relied on an earlier state of the law," *Hays* aptly remarked that such purpose "is hardly served by allowing later purchasers of property which has never been sold in subdivided form to take advantage of" the clause. (217 Cal.App.3d at p. 289.) In such cases, *Hays* reasoned, "the later purchaser placed no reliance on the prior state of the law." (*Ibid.*) The same may be said for the situation here, inasmuch as plaintiffs and all previous purchasers of the subject property dating back to 1865 acquired the property as a single unit or part of a single unit of land.

 Plaintiffs next contend that section 66451.10, subdivision (a) (section 66451.10(a)) offers additional grandfather protections that are applicable to the circumstances here. For the reasons below, we disagree.

Section 66451.10(a), commonly known as the "anti-merger provision," prevents local agencies from automatically merging contiguous legal parcels when those parcels come into common ownership: "[T]wo or more contiguous parcels or units of land *which have been created* under the provisions of this division, or any prior law regulating the division of land, or a local ordinance enacted pursuant thereto, *or which were not subject to those provisions at the time of their creation,* shall not be deemed merged by virtue of the fact that the contiguous parcels or units are held by the same owner, and no further proceeding under the provisions of this division or a local ordinance enacted pursuant thereto shall be required for the purpose of sale, lease, or financing of the contiguous parcels or units, or any of them." (§ 66451.10(a), italics added.)

By its own terms, section 66451.10(a) applies to only those units of land that already were "created" as separate parcels at some point in the past. As

---

[11] In *Hays,* the provision at issue "created an exemption from the act's requirements for 'any subdivision of land which has been staked out and in which sales or contracts of sale have actually been made prior to the adoption of this act, or [for] any subdivision a map of which has been duly recorded under the provisions of any previous act . . . .' (Stats. 1929, ch. 837, § 1, p. 1791.)" (*Hays, supra,* 217 Cal.App.3d at p. 289.)

we explained nearly a decade ago, the anti-merger protections of section 66451.10(a) "apparently sprang from a concern that without them, section 66424 would cause contiguous units of land that had already been qualified as separate parcels under the Act to be automatically merged by virtue of common ownership and thus to require further compliance with the Act before they could be sold separately." (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 753 [29 Cal.Rptr.2d 804, 872 P.2d 143] (*Morehart*).)

Section 66451.10(a) does not, however, address the creation of parcels in the first instance. Nor does it provide a basis for legal recognition of subdivided lots depicted on antiquated maps. As one court explained, the anti-merger provision has no application if "the lots were not legal subdivisions prior to the Map Act." (*Taft, supra,* 161 Cal.App.3d at p. 757.) Because plaintiffs fail to demonstrate through statutory or decisional authority that recordation of the Greene map in 1865 lawfully created the 12 parcels at issue, their reliance on section 66451.10(a) is misplaced.

Plaintiffs contend *Morehart, supra,* 7 Cal.4th 725, recognized a presumption that, although the ordinary effect of recording a subdivision map before 1893 would have been to create the subdivided parcels shown thereon, such a map might be found insufficient to create parcels because of inaccuracies or inadequate information. Because the Greene map accurately described the property it depicted, plaintiffs argue, *Morehart*'s presumption should be found to govern here. Plaintiffs' reliance on *Morehart* is misplaced.

As relevant here, *Morehart* held that the Act's anti-merger provision and related statutes (§§ 66451.10-66451.21) apply to parcels created before 1893, the effective date of the first statewide subdivision map statute. (*Morehart, supra,* 7 Cal.4th at pp. 760-762.) Although plaintiffs here correctly note that the property at issue in *Morehart* had been shown in subdivided form on a map recorded in 1888, the decision purposefully refrained from addressing the validity of subdivision maps recorded before 1893. As *Morehart* emphasized, the defendant county in that case admitted through pleadings that the subject property "was created by" a pre-1893 subdivision map. (7 Cal.4th at p. 761.) In light of that admission, *Morehart* found no need to "consider any of the prerequisites to creation of a parcel that preceded California's first subdivision map statute in 1893" and limited its inquiry to "whether a parcel so created is covered by the present Act's merger provisions." (*Ibid.*; see also *id.* at p. 765 (conc. opn. of Mosk, J.) ["What [section 66451.10(a)] does not set forth, and what the majority rightly do not decide today, is what constitutes the 'creation' of a parcel, subject to the state merger provisions, if that parcel purportedly came into existence prior to the first subdivision law in 1893."].) In light of these express statements, *Morehart* cannot be read as holding or otherwise suggesting a view that all subdivision maps recorded before 1893 are to be

given legal effect so long as they accurately and sufficiently describe the property therein.

Not only does the Subdivision Map Act not support plaintiffs' position, but issuing certificates of compliance based on the map Greene filed in 1865 would frustrate the Act's objectives "to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer." (*Gomes, supra,* 37 Cal.App.4th at p. 985; see *Hill v. City of Clovis, supra,* 80 Cal.App.4th at p. 445.)

That is, when substandard parcels, such as those at issue here,[12] are validated by certificates of compliance, they "may be sold, leased, or financed without further compliance with the Subdivision Map Act or any local ordinance enacted pursuant thereto." (§ 66499.35, subd. (f)(1)(E).) ▮▮▮ Thus, if we were to adopt plaintiffs' position and hold that local agencies must issue a certificate of compliance for any parcel depicted on an accurate, antiquated subdivision map, we would, in effect, be permitting the sale, lease, and financing of parcels: (1) without regard to regulations that would otherwise require consistency with applicable general and specific plans (§§ 66474, subd. (b), 66418, 66419) and require consideration of potential environmental and public health consequences (§ 66474, subds. (e), (f)); (2) without consideration of dedications and impact mitigation fees that would otherwise be authorized by the Act; and (3) without affording notice and an opportunity to be heard to interested persons and landowners likely to suffer a substantial or significant deprivation of their property rights (§ 66451.3; *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 616 [156 Cal.Rptr. 718, 596 P.2d 1134]).[13]

Because the provisions of the Map Act do not support such a result, and because the Act's objectives and protections would be thwarted if pre-1893

---

[12]As part of its resolution, the County Board of Supervisors found that the "lines drawn on the antiquated 1865 map entitled 'The Redwood Estate of S.H. Greene' were, for the most part, drawn in a simple grid, without regard to topography, natural resources, and community needs and without community review. The Board further finds and determines that the recognition of the lines drawn on that antiquated map could open the door to the creation of hundreds of parcels in the area inconsistent with the land use designations and acreage limitations of the Sonoma County General Plan as well as the policies underlying those designations and limitations. In particular, the Board finds and determines that resurrection of the 1865 map now . . . could raise serious concerns regarding the preservation of water supplies in a water scarce area, the protection of the scenic corridor, the protection of stream fisheries and other wildlife resources, and the preservation of other strong community interests in the area."

[13]Although recognition of a subdivision through a certificate of compliance does not confer any right to develop the resulting parcels, the subdivider may sell the parcels without providing for the infrastructure needed to service them. Once the property is in separate

recorded maps such as the Greene map were deemed sufficient by themselves to place parcels into compliance with the Act, we conclude the County properly denied plaintiffs' request for the 12 certificates of compliance.

CONCLUSION AND DISPOSITION

The Greene map did not establish a subdivision and did not create legally cognizable parcels in 1865 when it was recorded. Neither the provisions of the Subdivision Map Act nor the legal authorities cited by plaintiffs persuade us that the antiquated map must be given that effect today. Although the grandfather provisions of the Act reflect the Legislature's intent to protect those who detrimentally relied on prior subdivision laws in individual situations, they evince no intent to imbue antiquated maps with a legal significance that did not exist in their own time. Consistent with the Map Act's salutary purposes to facilitate local regulation of the design and improvement of subdivisions so as to encourage orderly community development (see *Taft*, *supra*, 161 Cal.App.3d at p. 755), we hold that antiquated subdivision maps, recorded in the absence of an applicable subdivision statute, ordinance, or regulation, did not in themselves establish subdivisions or create legal parcels that mandate the issuance of certificates of compliance for the subdivided parcels they depict.

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

---

ownership, development of necessary infrastructure may become far more difficult to coordinate and finance.