Filed 2/28/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TOWER LANE PROPERTIES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Appellant;<br><br>BRUCE KARSH et al.,<br><br>    Intervenors and Appellants. | B244092<br><br>(Los Angeles County<br>Super. Ct. BS137339) |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Affirmed.

Carmen A. Trutanich, City Attorney, Terry Kaufmann Macias, Supervising Attorney, Michael J. Bostrom, Deputy City Attorney, for Defendant and Appellant.

Jeffer, Mangels, Butler & Mitchell, Robert E. Mangels, Benjamin M. Reznik, Matthew D. Hinks for Plaintiff and Respondent.

Latham & Watkins, James L. Arnone, Jeffrey P. Carlin, Benjamin J. Hanelin for Intervenors and Appellants.

_____

Respondent Tower Lane Properties (Tower Lane) sought a grading permit from the City of Los Angeles (the City) for construction of a three-residence family compound over three contiguous hillside lots totaling 85,000 square feet. The City's engineers conditioned the permit upon compliance with Los Angeles Municipal Code section 91.7006.8.2, which states no grading permit shall be issued for a hillside site larger than 60,000 square feet unless a "tentative tract map" has been approved by a city planner.

Arguing no tentative tract map is required when a builder does not propose to subdivide the land, Tower Lane instituted writ proceedings to compel the City to set aside the permit condition. The trial court agreed that the Los Angeles Municipal Code requires no tentative tract map when a building project involves no subdivision of land, which Tower Lane's project did not. It therefore ordered the City to clear the permit condition. The City and two neighboring intervenor property owners appeal.

We agree with the trial court that a tentative tract map is required only when land is subdivided. Because Tower Lane proposed no subdivision, we affirm.

**Factual Background**

Tower Lane seeks to build a single-family residential compound on property located in the Benedict Canyon neighborhood of Los Angeles. The property consists of three separate but contiguous lots located in an area designated as "hillside" under the Los Angeles Municipal Code (LAMC).[1] On May 3, 2011, Tower Lane applied to the City's Department of Building and Safety for building and grading permits for 35,452 square feet of residential construction, including three residences, a pool and spa, a pool cabana building, a pool service and equipment building, accessory living quarters, and associated parking areas. The Department of Building and Safety forwarded the building plans to the City's Planning Department, which reviewed them to ensure compliance with City building codes.

During its review process the Planning Department notified Tower Lane that to obtain a grading permit it must comply with LAMC section 91.7006.8.2, which requires

---

[1] LAMC section 91.7003; undesignated section references will be to the LAMC.

approval by that department of a tentative tract map whenever grading will be conducted on a hillside area larger than 60,000 square feet.[2] Tower Lane objected to this requirement and applied for a waiver.

The City conditioned issuance of any waiver upon preparation of an environmental impact assessment under the California Environmental Quality Act, Public Resources Code section 21000 et seq. Refusing to prepare such an assessment, Tower Lane instead filed a petition for a writ of mandate to compel the City to clear the section 91.7006.8.2 requirement. Appellants Bruce and Martha Karsh, residents of Benedict Canyon who reside next to Tower Lane's property, intervened in the writ proceedings.[3]

The trial court found section 91.7006.8.2 by its plain language, regulatory context and historical application applies only when a hillside project involves subdividing land, which Tower Lane's project did not. The court therefore granted Tower Lane's petition and issued a writ directing the City to clear the section 91.7006.8.2 permit condition from Tower Lane's project.[4] The City and intervenors timely appealed.

---

[2] Section 91.706.8.2 provides: "No permit shall be issued for the import or export of earth materials to or from and no grading shall be conducted on any grading site in hillside areas having an area in excess of 60,000 square feet (5574 m$^2$) unless a tentative tract map has been approved therefor by the advisory agency. The advisory agency may waive this requirement if it determines that a tract map is not required by the division of land regulations contained in Chapter I of the Los Angeles Municipal Code."

[3] Intervenors request judicial notice of other recent writ proceedings involving Tower Lane and the City, arguing evidence in those proceedings rebuts Tower Lane's assertions on appeal that intervenors exercise improper influence over City employees. We deny the request because Tower Lane's allegations of improper influence are irrelevant to the issues presented on appeal. (*Arce v. Kaiser Found. Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.)

[4] Although the trial court ordered the City to clear the section 91.7006.8.2 permit condition, it did not order it to issue any permit to Tower Lane because other conditions had yet to be met. That decision not to order the issuance of the requested permit is not at issue in this appeal.

**Discussion**

## 1. Standard of Review

This appeal requires us to determine whether section 91.7006.8.2 applies to grading projects where real property will not be subdivided. "Interpretation of an ordinance presents a question of law that we review de novo." (*Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 919.)

## 2. Rules of Statutory Construction

"The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) The construction of a county ordinance is subject to the same standard. (*Dep't of Health Servs. v. Civil Serv. Com.* (1993) 17 Cal.App.4th 487, 494.) To ascertain such intent, we consider the words of the ordinance itself, as they are the most reliable indicators of the drafter's purpose. (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified Sch. Dist.* (2001) 90 Cal.App.4th 64, 69-70; *People v. Gardeley* (1996) 14 Cal.4th 605, 621.) We may not speculate that the enacting body meant something other than what it said (see *Unzueta v. Ocean View School District* (1992) 6 Cal.App.4th 1689, 1697), nor add to or alter an ordinance to accomplish a purpose that does not appear on its face (see *Burden v. Snowden, supra*, 2 Cal.4th at p. 562). For example, when a term has been expressly defined, we cannot rewrite that definition to mean something other than what has been prescribed. (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063.) Additionally, we construe the language in the context of the regulatory framework as a whole, keeping in mind the nature and purpose of the ordinance in which the language appears, and harmonizing, where possible, separate provisions relating to the same subject. (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950; *Lewis C. Nelson & Sons, Inc. v. Clovis Unified Sch. Dist., supra,* 90 Cal.App.4th at pp. 69-70.) When the intent is unambiguous, the plain meaning controls and there is no need for construction. (*People v. Gardeley, supra,* 14 Cal.4th at p. 621; *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*

4

(1992) 6 Cal.App.4th 1233, 1239.) Only if the language is unclear will we look to extrinsic aids to determine the drafter's intent. (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1239.)

**3.    Subdivision Map Act**

The Subdivision Map Act, Government Code section 66410 et seq., is "'the primary regulatory control' governing the subdivision of real property in California. [Citation.] The Act vests the '[r]egulation and control of the design and improvement of subdivisions' in the legislative bodies of local agencies, which must promulgate ordinances on the subject. (§ 66411.) The Act generally requires all subdividers of property to design their subdivisions in conformity with applicable general and specific plans and to comply with all of the conditions of applicable local ordinances." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996-997, fn. omitted (*Gardner*).)

"As used in the Act, 'subdivision' means 'the division, by any subdivider, of any unit or units of improved or unimproved land . . . .' ([Gov. Code,] § 66424.) Ordinarily, subdivision under the Act may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved." (*Gardner*, *supra*, 29 Cal.4th at p. 997.)

A tentative map is a map showing the design and improvement of a proposed subdivision of five or more parcels and the existing conditions in and around it. (Gov. Code, § 66424.5, subd. (a).) A final map is an approved map of a proposed subdivision that is substantially similar to the tentative map, including any required alterations. (Gov. Code, § 66426; *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1042.)

"A local agency will approve a tentative and final map or a parcel map only after extensive review of the proposed subdivision and consideration of such matters as the property's suitability for development, the adequacy of roads, sewer, drainage, and other services, the preservation of agricultural lands and sensitive natural resources, and dedication issues. [Citations.] [¶] By generally requiring local review and approval of

5

all proposed subdivisions, the Act aims to 'control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general.' [Citation.] More specifically, the Act seeks 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer.' [Citations.]" (*Gardner*, *supra*, 29 Cal.4th at pp. 997-998; *Sixells, LLC v. Cannery Bus. Park* (2008) 170 Cal.App.4th 648, 652.)

The Subdivision Map Act delegates "[r]egulation and control of the design and improvement of subdivisions" to local agencies, "which must promulgate ordinances on the subject." (Gov. Code, § 66411; *Gardner*, *supra,* 29 Cal.4th at p. 997.) To implement the subdivision process mandated by the Subdivision Map Act, the City of Los Angeles enacted Article 7 of Chapter I of the LAMC. The first provision of Article 7 states Article 7 "shall be known as the Division of Land Regulations of the City of Los Angeles, and contains the City's regulations regarding Subdivision Maps." (§ 17.00 et. seq.; hereafter Article 7 or the Division of Land Regulations.)

The stated purpose of Article 7 "is to regulate and control the division of land, within the City of Los Angeles . . . , [and] to supplement the provisions of the Subdivision Map Act concerning the design, improvement and survey data of subdivisions, the form and content of Tentative Maps and Final Maps, and the procedure to be followed in securing the official approval of the City of Los Angeles on such maps, consistent with the applicable general and specific plans as well as the public health, safety and welfare." (§ 17.01, subd. (B).) It is also the intention of Article 7 to ensure "that the subdividing of land in the City of Los Angeles be done in accordance with the grading regulations of the City contained and set forth in Article 1 of Chapter 9 of [the LAMC] and to establish when possible beauty and attractiveness in the hills consistent with watershed drainage, erosion and fire control requirements, and good engineering practices." (*Ibid*.)

The LAMC makes an "advisory agency" responsible for approval of subdivisions, authorizing the agency to make "investigations and reports on the design and

6

improvement of proposed subdivisions" and "to approve, conditionally approve, or disapprove Tentative Maps of proposed subdivisions." (§ 17.03, subd. (A); see also Gov. Code, § 66415 [defining "advisory agency" as "a designated official or an official body charged with the duty of making investigations and reports on the design and improvement of proposed division of real property, the imposing of requirements or conditions thereon, or having the authority by local ordinance to approve, conditionally approve or disapprove maps"].)

The LAMC defines a tentative map as: "a map made for the purpose of showing the design of a proposed subdivision *creating five or more parcels*, . . . and showing the existing conditions in and around it . . . ." (§ 17.02, italics added.) A tract map may be either a tentative map or a final map. (*Ibid.*)

The Division of Land Regulations also requires that subdivision of land be "done in accordance with the grading regulations of the City" contained in the LAMC's Building Code. (See §§ 17.01, subd. (B), 91.101 et. seq., 91.7001 et. seq.) A permit is required for grading. (§ 91.106.1.2 ["No person shall commence or perform any grading, and no person shall import or export any earth materials to or from any grading site, without first having obtained a permit therefor from the Department"].) Grading permits are issued by the Department of Building and Safety. (§ 91.202 ["**DEPARTMENT** is the Department of Building and Safety"].) Section 91.7006 of the Building Code governs "Conditions Precedent to Issuing a Grading Permit." Subsection 91.7006.8 is a heading: "Conformance with Zoning Regulations Required." Subsection 91.7006.8 contains two ordinances: 91.7006.8.1 and 91.7006.8.2. Section 91.7006.8.1, which immediately precedes the Ordinance in question and is entitled "Subdivision Map Act," requires that all grading permits comply with the Subdivision Map Act.[5] (§

---

[5] Section 91.7006.8.1 states: "No permit shall be issued for any grading or import or export of earth materials to or from any grading site except in compliance with the zoning, private street and division of land regulations contained in Chapter I of the Los Angeles Municipal Code, the Subdivision Map Act of the State of California and the approved master plan for the area in which the grading is to be done." (§ 91.7006.8.1.)

91.7006.8.1.)  As noted, section 91.7006.8.2, entitled "Tentative Tract Map," conditions grading on large hillsides on the approval of a tentative tract map.

The City charges a fee for the review of a grading plan under the Ordinance, as set forth in section 19.02, subdivision (F).[6]  That section establishes a $12,201 fee for "[r]eview of grading plans in hillside areas having an area in excess of 60,000 square feet to determine whether a tract map is required to be filed."  (§ 19.02, subd. (F).)

**4.      The Ordinance Applies to Subdivisions Only.**

**The language of the Ordinance is subdivision-specific.**

The Ordinance by its plain language applies to subdivisions only.  The Ordinance states:  "No permit shall be issued for the import or export of earth materials to or from and no grading shall be conducted on any grading site in hillside areas having an area in excess of 60,000 square feet (5574 m$^2$) unless a *tentative tract map* has been approved therefor by the advisory agency.  The *advisory agency* may waive this requirement if it determines that a tract map is not required by the division of land regulations contained in Chapter I of the Los Angeles Municipal Code."[7]  (§ 91.7006.8.2, italics added.)  The terms "tentative tract map" and "advisory agency" are defined solely in, and operate exclusively under, the auspices of the Division of Land Regulations.  A tentative map depicts "the design of a proposed *subdivision* creating five or more parcels."  (§ 17.02, italics added.)  The advisory agency "investigat[es] and reports on the design and improvement of proposed *subdivisions*," "approve[s], conditionally approve[s], or disapprove[s] Tentative Maps of proposed subdivisions," and "report[s] directly to the subdivider the action taken on the Tentative Map."  (§ 17.03, subd. (A), italics added.)

---

[6] We grant appellant City's request to take judicial notice of sections of the LAMC.  (*Trinity Park, L.P. v. City of Sunnyvale* (2011) 193 Cal.App.4th 1014, 1027 [We may take judicial notice of local ordinances and other official resolutions, reports and acts of a city].)

[7] The Ordinance was originally adopted in 1964 and was reenacted without change in 1998.

8

But here, Tower Lane is not a subdivider and proposes no further division of land or creation of five or more parcels.

The Division of Land Regulations is the City's response to requirements set forth in the Subdivision Map Act, which defines "advisory agency" as "a designated official . . . charged with the duty of making investigations and reports on the design and improvement of proposed *divisions* of real property" and "tentative map" as "a map made for the purpose of showing the design and improvement of a proposed *subdivision*." (Gov. Code, §§ 66415, 66424.5, subd. (a), italics added; see *id*. at §§ 66424, 66426.) But again, Tower Lane proposes no division or subdivision.

Appellants argue the "tentative tract map procedure" used by the advisory agency is "important to the City" and "well suited for analyzing the potential impacts of hillside grading." For example, when determining whether to approve a tentative tract map, the agency must determine whether a project is consistent with the goals and policies of the City's general plan and any specific plan; whether the site is physically suitable for the type of development proposed; whether the proposed improvements are likely to cause serious public health problems; and whether the improvements will conflict with access easements. (See Gov. Code, § 66474 [stating the grounds for denial of a tentative map].) Appellants contend "[t]hese are precisely the inquiries the City should make in determining whether and under what conditions to allow large grading projects in hillside areas."

It is not our place to decide whether the City should make these inquiries, only whether section 91.7006.8.2 mandates them. It does not. Prescriptions for the inquiries appellants propose are already found in sections 91.7002 and 91.7006.1 through 91.7006.4 of the Building Code, which assign many of the inquiries to soils engineers and geologists. Reference to the advisory agency is made nowhere in the "Grading, Excavations and Fills" division of the Building Code (§ 91.7001 et seq.). The Ordinance, by contrast, calls upon the advisory agency only for evaluation of a tentative tract map, which exists only to describe a land subdivision. We therefore conclude the Ordinance assigns duties pertaining only to subdivisions.

9

Appellants argue the Ordinance should properly be read to require approval of a grading plan because the word "therefor" means no permit shall be issued unless a tentative tract map has been approved "for the grading" by the advisory agency. We disagree. The Ordinance provides: "No permit shall be issued for the import or export of earth materials to or from and *no grading* shall be conducted on any *grading site* in hillside areas having an area in excess of 60,000 square feet (5574 m$^2$) unless a tentative tract map has been approved *therefor* by the advisory agency." (§ 91.7006.8.2, italics added.) A tentative tract map shows the design and improvement of a proposed subdivision site and the existing conditions around the site. (See 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 811, subd. (1).) The subject of a tentative tract map is thus the site itself, not the "grading" on it.

The statutory framework surrounding the Ordinance supports our conclusion that the City intended the Ordinance to apply to subdivisions only. The LAMC is organized as a numbered outline list with several nested levels, each level reflected by a corresponding digit. For example, section 91.7006.8.2, with which we are concerned, falls within chapter 9, article 1, division 70, and section 06, and itself constitutes subdivision 2 of subsection 8 of that section. Hence section "91.7006.8.2." (All numbered ordinances in the LAMC are called "sections" whether they constitute sections, subsections, or subdivisions.)

Subsection 8 of section 6 (§ 91.7006.8) constitutes only a title: "Conformance with Zoning Regulations Required." But nested under the title are two subdivisions, subsection 91.7006.8.1 and our ordinance, subdivision ("section") 91.7006.8.2.

Subdivision 91.7006.8.1, entitled "Subdivision Map Act," conditions "any grading or import or export of earth materials to or from any grading site" on "compliance with the zoning, private street and division of land regulations contained in Chapter I of the Los Angeles Municipal Code, the *Subdivision Map Act* of the State of California and the approved master plan for the area in which the grading is to be done." (§ 91.7006.8.1, italics added.) And as we have seen, subdivision 2, the Ordinance, adds an additional condition: A tentative tract map when grading is done on a hillside area larger than

10

60,000 square feet. Although the Ordinance itself does not mention subdivision (other than obliquely, through reference to a tentative tract map and advisory agency), its pairing with subdivision 1 within subsection 91.7006.8 indicates the City meant for the Ordinance to operate in the same context as does subdivision 1, i.e., when a project involves land subdivision. (See *People v. Hull* (1991) 1 Cal.4th 266, 272 [chapter and section headings are entitled to considerable weight].)

Moreover, the fee provision, set forth in section 19.02, subdivision (F), which provides for "review of grading plans in large hillside areas to determine if a tract map is required to be filed," also supports the subdivision-only interpretation. Use of the term "tract map," a subdivision-specific term, indicates the application fee operates when the City reviews grading plans for hillside subdivision sites.

Applying the Ordinance only to subdivisions is also consistent with the purpose of the statutory scheme, specifically section 91.7006.8, the City's grading regulations, and the Subdivision Map Act, which harmonize subdivision approval and grading regulations. (See §§ 17.01, subd. (B), 91.7006.8.1.) Appellants argue the purpose of the Ordinance is to protect the integrity of all hillsides and hillside communities from harmful grading. We disagree, as hillside grading is extensively addressed elsewhere in the Building Code. For example, section 91.7004 requires that any hillside grading plan be prepared by a civil engineer and conform to the Building Code to the satisfaction of the Superintendent of Building. (§§ 91.7003, 91.7004.) Section 91.7004 also requires that hillside grading itself be inspected by a civil engineer, soils engineer and engineering geologist, any of whom may require revisions to the grading plans. (§§ 91.7004, 91.7008.)

The purpose of the Ordinance is to ensure that grading on large hillside subdivision sites is done in accordance with the purpose and goals of the Division of Land Regulations. This allows the City to control grading for an anticipated subdivision. In the absence of the Ordinance, a subdivision developer could first obtain a grading permit, complete the grading work, then apply for subdivision approval. The City would then be unable to control or condition the grading as part of the subdivision approval process. The Ordinance closes this potential loophole by articulating that some review of

11

the subdivision plans, whether an approval of a tentative tract map or a waiver, must take place before any grading can occur in hillside areas.

**The waiver provision does not compel an alternative interpretation.**

Appellants contend that applying the Ordinance only to subdivisions renders the second sentence of the Ordinance surplusage because the advisory agency would never have discretion to waive a tract map when a tentative tract map is not required in the first place. The second sentence of the Ordinance states, "The advisory agency may waive [the tentative tract map] requirement if it determines that a tract map is not required by the division of land regulations contained in Chapter I of the Los Angeles Municipal Code." (§ 91.7006.8.2.) Appellants argue that if the Ordinance was intended to apply to subdivisions only, then the second sentence would provide that the Advisory Agency *shall* waive the tentative tract map requirement if it finds that no tract map is required under the Division of Land Regulations.

Although appellants argue that the subdivision-specific interpretation renders this waiver provision superfluous, we fail to find a more compelling interpretation that gives the waiver provision meaning. Although a construction rendering some words surplusage should be avoided if possible, the rule is not absolute. (*Santa Clara County Local Transp. Auth. v. Guardino* (1995) 11 Cal.4th 220, 234-235; *People v. De Porceri* (2003) 106 Cal.App.4th 60, 69 [the principle "is merely a guide and should not be employed to defeat legislative intent"].) We agree with the trial court that drafters often "say in 10,000 words what they can say in 1,000." Because the language of the Ordinance makes apparent that the City intended it to apply to subdivisions only, the redundant nature of the waiver provision does not overcome that intent. The plain meaning of the Ordinance is clear and unambiguous, and therefore the language of the Ordinance controls.

12

**5.     Judicial Deference to the City Agencies' Interpretation is Unwarranted**

Appellants urge us to defer to the City's interpretation of the Ordinance.[8]  In October 2011 and January 2012, the City issued two memoranda detailing the City agencies' application of the Ordinance to hillside building projects.  The memoranda stated the Ordinance applied to all large hillside projects[9] and set out a detailed procedure for obtaining approval of a grading plan or a waiver of the grading plan approval requirement.  Under the new procedure, all large hillside grading projects must undergo some level of environmental review under the California Environmental Quality Act.

While recognizing that an agency's interpretation must be given great weight, the interpretation is not binding, and ultimate responsibility for interpretation of an ordinance rests with the court.  (See *Brown v. Fair Political Practices Com.* (2000) 84 Cal.App.4th 137, 150.)  The level of deference we accord to an agency's interpretation turns on "whether the agency has a comparative interpretive advantage over the courts, and also whether its interpretation is likely to be correct." (*Ibid.*)  Factors to consider in determining if an agency has a comparative advantage include whether "the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12.)  Here, interpretation of the Ordinance requires no technical expertise that would give the City agencies a comparative interpretative advantage.

Further, we consider whether an agency has consistently followed its putative interpretation, and how long it has done so. (*Slocum v. State Board of Equalization* (2005) 134 Cal.App.4th 969, 974; see also *Yamaha Corp. of Am. v. State Board of Equalization, supra,* 19 Cal.4th at p. 13 [an interpretation is more likely to be correct where there is evidence "that the agency 'has consistently maintained the interpretation in

---

[8] The Department of City Planning and the Department of Building and Safety (the City agencies) share responsibility for permitting.

[9] For purposes of this opinion, a "large hillside" is an area larger than 60,000 square feet.

question, especially if it is longstanding'"; "'a vacillating position . . . is entitled to no deference' [citation]."

Here, the City's historical position on the Ordinance has been unclear and inconsistent. Appellants offer city attorney opinions from 1990 and 1999 as evidence of the City's purported long-standing interpretation. The first opinion provides advice to the advisory agency regarding waiver of a tentative tract map to obtain a grading permit for hillside development of 13 single family lots on a site subdivided in the 1920's. The city attorney stated that the advisory agency's waiver determination under the Ordinance required environmental review. The second opinion, a letter to a councilman who requested a determination of whether a tract map was required prior to the issuance of a grading permit "for the development of 93 single family homes, on an existing tract approved in 1902 prior to modern environmental procedures and regulations," set forth "the legal principles and standards that are involved in consideration of a waiver request."

City attorney opinions construing a local ordinance are entitled to consideration, just as attorney general opinions construing a state statute are entitled to consideration. (*DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 19 [overruled on other grounds by *Yamaha Corp. of Am. v. State Board of Equalization, supra,* 19 Cal.4th 1].) However, the opinions proffered by appellants discussed the Ordinance only in the context of subdivision of land. The opinions do not establish that the Ordinance has been applied to non-subdivided projects.[10]

---

[10] Appellants argue that because the Ordinance was reenacted in 1998 after these city attorney opinions, the City is presumed to have been aware of and adopted the city attorney's construction. (See *DeYoung v. City of San Diego, supra,* 147 Cal.App.3d at pp. 18-19.) Assuming this is true, the point does not assist appellants because, as discussed, the city attorney opinions dealt only with subdivisions of land occurring before environmental regulations were enacted. At any rate, an agency's erroneous interpretation that alters or enlarges the terms of an ordinance does not govern our interpretation, even if the ordinance is subsequently reenacted without change. (See *Traverso v. People ex rel. Dep't of Transp.* (1996) 46 Cal.App.4th 1197, 1206-1207.)

14

Appellants advance only three non-subdivision projects since 1964 to which the Ordinance has been applied.[11] These projects include: (1) construction of two buildings consisting of warehouse and office space with associated parking; (2) construction of an 86-bed addition to an existing 117-bed nursing home; and (3) construction of two single-family homes in a large hillside area.

Although the Ordinance was applied to these projects, no evidence indicates they were required to undergo discretionary review to obtain a grading permit waiver.[12] Instead, the evidence suggests these projects underwent a routine clearance that involved no environmental assessment. Moreover, the only example involving a single-family residence was merely a request by the permit applicant for a determination that a tract map was *not* required.

Substantial evidence indicates the City agencies have not followed any consistent and long-standing interpretation of the Ordinance. Of 11 permits issued between 2000 and 2011 for grading on large hillside areas, only two make even vague reference to any requirements related to grading on a site in excess of 60,000 square feet. One simply states that such grading required a "special inspect," while the other notes the requirement was cleared because the applicant was exempt. Additionally, Tower Lane's predecessors obtained two grading permits for the property in 2005 and 2006, and the Karshes obtained grading permits for nine projects on their large hillside property, all without undergoing any environmental review under the Ordinance. Thus, out of 22 grading permits for properties having hillside grading sites larger than 60,000 square feet,

---

[11] In contrast, in a five month period after the City's January 2012 memorandum spelling out a procedure for approval under the Ordinance, the Ordinance was applied to 14 projects.

[12] Discretionary review occurs when the City has the regulatory power to eliminate or mitigate any of a project's adverse environmental consequences. (*Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 267.) Whenever the City undertakes discretionary review, an environmental assessment is required under CEQA. (*Id.* at p. 272; Cal. Code Regs., tit. 14, § 15268.)

15

only one required any type of clearance, which was obtained without undergoing any environmental review.

Moreover, City officials themselves offer inconsistent interpretations of the Ordinance. Ifa Kashefi, the current Deputy Superintendent of Building and an employee of the City's Department of Building and Safety since 1985, stated in a declaration, "As long as I have been at the Department, the Department's interpretation of Section 91.7006.8.2 has been that the Section does apply to projects that propose no subdivision." But Hamid Behdad, a Department of Building and Safety plan check and grading engineer for 18 years, declared, "I understood the Ordinance to be applicable only in the case of grading in connection with subdivision projects."

The only clear evidence of the City's application of the Ordinance to all large hillside grading projects are the two recent City memoranda discussed above. But these memoranda were not released until after Tower Lane applied for permits. No evidence suggests the detailed procedure now required by the Planning Department existed prior to the January 2012 memorandum. An agency's undisclosed unilateral interpretation is not entitled to deference. Because the City cannot point to a consistent and long-standing interpretation, its current interpretation is entitled to no deference. (See also *Southern Cal. Edison Co. v. Pub. Utilities Com.* (2000) 85 Cal.App.4th 1086, 1105 ["[A]n agency's interpretation of a regulation or statute does not control if an alternative reading is compelled by the plain language of the provision"].)

Appellants argue that Tower Lane's project should be subject to discretionary review under the Ordinance because the project will have significant environmental impacts. Environmental review of large hillside grading projects like Tower Lane's residential compound may be desirable public policy, but "'[c]ourts must take a statute as they find it, and if its operation results in inequality or hardship in some cases, the remedy therefor lies with the legislative authority.'" (*Unzueta v. Ocean View School District, supra,* 6 Cal.App.4th at p. 1697.) The trial court properly interpreted the Ordinance to apply to subdivisions only.

16

**Disposition**

The judgment is affirmed.  Respondents are to recover costs on appeal.

CERTIFIED FOR PUBLICATION.


                                        CHANEY, J., Acting P. J.


We concur:


JOHNSON, J.


MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.