**In re EL DORADO IMPROVEMENT CORPORATION, Debtor.**

**Sundt Corporation, Appellant,**

**v.**

**Dynamic Finance Corporation, Appellee.**

**No. 00–57066.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2002.

Filed July 3, 2003.

Douglas E. Griffin, Lang, Richert & Patch, Fresno, CA, for the appellant.

Mark W. Dykes, LeBoeuf, Lamb, Greene & MacRae, LLP, Salt Lake City, UT, for the appellee.

Before: BEEZER, KOZINSKI and WARDLAW, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge.

One commentator describes the frontier equivalent of mechanic's liens:

If you furnish lumber to a man to build his house and he doesn't pay you, you shoot him. If he sells the house and the new owner refuses to pay you, you shoot the new owner.[1]

What this regime lacked in due process, it made up for in clarity, the importance of which is driven home by the somewhat opaque issue we tackle in this case: whether a South Lake Tahoe redevelopment project was "subject to acceptance by any public entity" under California's mechanic's lien law.

1. The redevelopment project at issue was a public-private joint venture between the South Tahoe Redevelopment Agency (the "Agency"), a municipal agency, and El Dorado, a developer and landowner. The project was intended to address urban blight in the City of South Lake Tahoe, and envisioned construction of a luxury hotel, marina building and parking structure, as well as an artificial wetland and estuary and a view corridor to the lake.

The City enacted a redevelopment ordinance, and El Dorado and the Agency signed a Disposition and Development Agreement (the "Agreement") spelling out their respective duties. The Agreement required the Agency to acquire various properties and exchange them for properties El Dorado owned. El Dorado would then oversee construction of the project, while the Agency would pay for related public improvements. The Agency had several rights under the Agreement: It had approval authority over all construction drawings and plans, as well as any financing secured by the property. It also held a right of reverter if El Dorado failed to perform. The Agreement required the Agency to issue a "Certificate of Completion" once El Dorado finished work, which would be "conclusive evidence of satisfac-tory completion of the [project] construction required by this Agreement, ... in full compliance with the terms hereof." Upon issuance of the certificate, the Agency's right of reverter and various approval rights would lapse.

The project was also under the jurisdiction of the Tahoe Regional Planning Agency (TRPA), a multistate environmental regulatory authority that oversees development in the Lake Tahoe region. The TRPA had to approve the project both before and after construction, and El Dorado had to post a bond to ensure compliance.

Sundt was El Dorado's general contractor and Dynamic Finance was El Dorado's lender. Sundt performed some preparatory groundwork for the hotel site, including excavation and grading. After work began, Dynamic recorded a deed of trust on the premises to secure its loan. El Dorado unfortunately ran into financial difficulty and filed for bankruptcy, owing money to both Sundt and Dynamic. The bankruptcy court sold off the project, and Sundt and Dynamic now dispute priority to the proceeds. Sundt asserts it has a mechanic's lien that trumps Dynamic's deed of trust. Dynamic responds that Sundt's lien is invalid because it was recorded too late. The bankruptcy court found the lien untimely. The district court summarily affirmed, and Sundt now appeals.

2. California, like other states, allows those who furnish labor or supplies to a construction project to claim a mechanic's lien on the property, a right guaranteed by the state constitution. Cal. Const. art. XIV, § 3. If the owner fails to pay for services rendered, the lienholder

1. Craig Penner Bronstein, Comment, *Trivial(?) Imperfections: The California Mechanics' Lien Recording Statutes*, 27 Loy. L.A. L. Rev. 735, 736 (1994).

can foreclose to recoup the debt. The lienholder has priority over the debtor's general creditors and any security interest that attached after construction began. *See generally* 10 Miller & Starr, *California Real Estate* §§ 28:2,:4–5, at 11–14, 18–24 (3d ed.2001); James Acret, *California Construction Law Manual* §§ 6.01–.02, at 354–55, 358 (5th ed.1997). The prospect of unknown liens makes property more difficult to sell, so state law requires lien claimants to record their liens in the public records promptly after construction is complete. Claimants generally have 90 days from completion to record, although the owner can take steps to shorten this period. *See* Cal. Civ.Code §§ 3115–16.

■ This deadline seems clear enough, but it's only as certain as the day you start counting. Parties often disagree about when a project is complete, particularly when only some minor details are outstanding. *See, e.g., Lewis v. Hopper,* 140 Cal.App.2d 365, 366, 295 P.2d 93 (1956) (considering whether a project was complete once four soap dispensers were installed); Acret § 6.12, at 380–81. Perhaps to forestall some of these disputes, California law prescribes "completion equivalents"—events deemed to constitute completion. These include (a) the date the owner occupies or first uses the premises (assuming construction has ceased); (b) the date the owner "accepts" the project; and (c) the date following certain work stoppages. Cal. Civ.Code § 3086(a)-(c). This case involves a fourth completion equivalent, applicable only to a limited class of projects:

> If the work of improvement is *subject to acceptance by any public entity,* the completion of such work of improvement

shall be deemed to be the date of such acceptance....

*Id.* § 3086 (emphasis added). Unlike the other completion equivalents, this one is exclusive: If it applies, it governs regardless of completion in any other sense.

The parties stipulated to all issues save whether the development project was "subject to acceptance by any public entity." If it was, Sundt's lien was timely recorded; if not, Sundt missed the boat. Sundt claims its work was subject to acceptance by both the Agency and the TRPA. It contends its obligations (a) to procure a certificate of completion from the Agency and (b) to obtain post-construction approval from the TRPA both constitute public acceptance requirements. Dynamic thinks not, and we decide.

**3.** The statute does not define the phrase "subject to acceptance by any public entity." California cases often apply the provision to public works, i.e., those built under contract with a public entity. *See, e.g., Dep't of Indus. Relations v. Fidelity Roof Co.,* 60 Cal.App.4th 411, 418, 70 Cal.Rptr.2d 465 (1997). In this context, the public entity's acceptance is essentially equivalent to a private owner's acceptance under subsection 3086(b).[2]

California cases also apply the provision to other works, typically civic improvements such as roads, sidewalks, gutters or sewers built under private contract in connection with otherwise private construction projects. *See A.J. Raisch Paving Co. v. Mountain View Sav. & Loan Ass'n,* 28 Cal.App.3d 832, 834–35, 836–37, 105 Cal. Rptr. 96 (1972) (streets, curbs, gutters, sidewalks, etc.); *Howard A. Deason & Co. v. Costa Tierra Ltd.,* 2 Cal.App.3d 742, 752–53, 83 Cal.Rptr. 105 (1969) (streets,

---

**2.** Public works are exempt from mechanic's liens, Cal. Civ.Code § 3109, but the public acceptance provision is relevant because it determines the timeliness of stop notices. *See* 10 Miller & Starr § 28:56, at 185–86.

curbs, gutters, sidewalks); *Southwest Paving Co. v. Stone Hills*, 206 Cal.App.2d 548, 553–56, 24 Cal.Rptr. 48 (1962) (presumably streets); *Richards v. Hillside Dev. Co.*, 177 Cal.App.2d 776, 778, 782, 2 Cal.Rptr. 693 (1960) (streets, sewers, water mains); *McGaw v. Master Craft Homes*, 105 Cal. App.2d 304, 306, 316, 233 P.2d 185 (1951) (streets, curbs, gutters, sidewalks); *cf. A.A. Baxter Corp. v. Home Owners & Lenders*, 7 Cal.App.3d 725, 730, 733–34, 86 Cal.Rptr. 854 (1970) (grading, excavation, storm drains).

The leading case is *Howard A. Deason & Co. v. Costa Tierra Ltd.*, 2 Cal.App.3d 742, 83 Cal.Rptr. 105 (1969), where various contractors claimed liens in connection with an apartment complex and related site work, asserting the project was subject to acceptance by the city. They pointed to several authorities, including the city's building code and a subdivision ordinance requiring inspection and approval of street work by the city engineer. *Id.* at 748–49 & n. 3, 83 Cal.Rptr. 105. *Deason* held that the subdivision ordinance was an acceptance requirement but that the building code was not. It explained:

> Routine inspections and approvals prior to commencement and during the progress of the work of improvement ... are not equivalent to a requirement of acceptance of the entire project by the governmental authority.... Certificates of occupancy are issued after final inspection and determination that the building complies with provisions of the building code and relate only to the purposes for which a building is used or intended to be used. They are not evidence of acceptance or requirement of acceptance of the work of improvement....
>
> ....

... Defendants argue on this appeal that most localities throughout the state have adopted similar building codes governing all phases and types of construction; that if this be deemed a requirement for "acceptance" by a governmental agency, then [the other completion equivalents] would not be effective in most instances. We do not believe the Legislature intended [this] result.

....

> We hold that the phrase "subject to acceptance" ... is not to be equated with inspection and approval or the issuance of certificates of occupancy under building regulations, but must find its base in some legislative enactment by the public authority.

*Id.* at 750–51, 83 Cal.Rptr. 105.

Sundt argues that both the certificate of completion and the TRPA approval requirements "find [their] base in some legislative enactment by the public authority." Sundt notes, for example, that development agreements are legislative acts under state law. *See* Cal. Gov't Code § 65867.5(a). Dynamic does not dispute this issue, and we treat it as conceded.

What the parties do dispute is what *additional* characteristics approval must have in order to constitute public acceptance. Sundt seems to concede that *Deason*'s legislative enactment test is necessary but not sufficient. It suggests that public acceptance must also "go[ ] beyond routine matters [inherent] in any construction project." Dynamic argues for a narrower definition, and the bankruptcy court agreed, holding that acceptance means "receiving the work of improvement as public property or for public use."

Both positions are tenable as a matter of plain English. *Webster's* defines "accept" as both "to approve" and "[t]o receive with

favor." *Webster's New International Dictionary of the English Language* 14 (William Allan Neilson et al. eds., 2d ed.1939). But the word is also a term of art in the field of public dedication, and understanding its significance in that context is crucial to interpreting section 3086.

Private construction projects, such as those commonly found in subdivision developments, often involve improvements like streets, sidewalks, gutters, sewers and so on. Development plans typically call for the dedication of these improvements to public use upon completion: The municipality assumes a public interest in the improvement, perhaps as fee simple or some sort of easement. *See* 10 Miller & Starr § 26:7, at 18; Olin L. Browder et al., *Basic Property Law* 807–09 (5th ed.1989). The municipality often also assumes responsibility for maintenance. *See* Browder at 808; Acret § 6.12, at 382. Because of the prospect of public use and upkeep, a developer cannot unilaterally dedicate an improvement to the public. Rather, public officials must consent, and typically do so by determining that the improvement was satisfactorily built. This is the process technically known as "acceptance." *See* 10 Miller & Starr §§ 26:19–20, at 44, 48; Browder at 808; *e.g., Gardner v. County of Sonoma,* 29 Cal.4th 990, 1002 n. 9, 129 Cal.Rptr.2d 869, 62 P.3d 103 (2003). This sense of the term has aspects of both common meanings: The municipality "receive[s] with favor" a public interest in the improvement when its officials "approve" the adequacy of its construction.

■ We conclude that the reference to "acceptance by any public entity" in section 3086 must be interpreted in light of this definition, and that a private work is "accepted" only if it is civic in nature, in that approval results in the assumption of some public interest in it. Several considerations support this conclusion. First,

California state court decisions almost invariably involve civic improvements in subdivision developments—streets, sidewalks, gutters, sewers and so on. *See* cases cited p. 838–39 *supra.* While the cases do not explicitly invoke the concept of public dedication and do not purport to mark the outer boundary of the term "acceptance," the consistency with which cases arise in this context is evidence of the term's meaning. Leading texts also suggest this interpretation. *See* 10 Miller & Starr § 28:55, at 183–85 (discussing the *Deason* line of cases in the context of "private contracts for the construction of public improvements to be dedicated to the public"); Acret § 6.12, at 381–82 (explaining *Deason* on the ground that "a public entity, by accepting such improvements, assumes the responsibility of maintenance of those improvements").

Our construction also comports better than Sundt's with the text of the statute. Sundt's proposed distinction between routine and nonroutine approvals is a plausible enough reading of *Deason,* but it is hard to anchor anywhere in the statutory text. The distinction we draw, on the other hand, is consistent with both the statute (which refers to acceptance rather than approval) and with *Deason* (because building authorities do not accept the structures they approve). *See* 2 Cal. App.3d at 751, 83 Cal.Rptr. 105.

Sundt argues that statutory history supports its reading of the provision. Until 1963, section 3086's precursor, former California Code of Civil Procedure § 1193.1(e), provided: "If a work of improvement is of the character referred to in Section 1184.1 of this code and is subject to acceptance by any public or governmental authority, the completion of such work of improvement shall be deemed to be the date of such acceptance." *Deason,* 2 Cal. App.3d at 747–48, 83 Cal.Rptr. 105 (inter-

nal quotation marks omitted). Section 1184.1, in turn, covered site improvements: "grading, filling or otherwise improving the land itself, or the streets, highways or sidewalks fronting or adjoining the lots, the installation of sewers or other public utilities and construction of areas, vaults, cellars or rooms under the sidewalks." *Id.* at 748, 83 Cal.Rptr. 105; *cf.* Cal. Civ.Code § 3102 (current version). *Deason* explained that "[t]he improvements mentioned by section 1184.1 have been characterized by text writers as 'civic,' since the governmental authority may have a continuing concern in their installation and maintenance as it affects other properties and governmental functions of the public entity." 2 Cal.App.3d at 752, 83 Cal.Rptr. 105 (citations omitted); *see also* 10 Miller & Starr § 28:55, at 183–84 ("[S]treets, sidewalks, sewers, gutters, and other improvements that serve adjacent property which will be dedicated to the public [are known as] 'site improvements.'"). Because section 3086's precursor applied only to certain civic improvements, the word "acceptance" was likely used in its public dedication sense. The reference to section 1184.1, however, was deleted in 1963, *see Deason*, 2 Cal.App.3d at 748, 83 Cal.Rptr. 105, and has no counterpart in current section 3086.

Sundt argues that, as went the reference, so went any requirement that an improvement be civic. This is one plausible interpretation of the amendment, but not the only one. Section 1184.1 did not run the gamut of civic improvements, but rather listed only particular ones—namely, site improvements. Another plausible interpretation of the amendment, therefore, is that the legislature broadened the provision's coverage beyond site improvements, but did not implicitly redefine "acceptance" to mean mere approval.

Sundt also contends that our reading of "acceptance" creates a statutory inconsistency. Subsection 3086(b) specifies acceptance by the owner of the property as another completion equivalent. Sundt argues that our interpretation causes "acceptance" to mean one thing for public entities and something else for owners: Public acceptance implies assumption of an interest the acceptor does not already own, while owner acceptance does not. We see no inconsistency. An owner "accepts" by indicating his assent to take delivery of the improvement as built. A public entity "accepts" by indicating its assent to receive a dedication as offered. The two are closely analogous, and if the latter involves a technical transfer of interest where the former does not, it is only because the party accepting in the former case is already, by definition, the owner. That distinction is merely a natural consequence of the difference between an owner and a public entity, not an artificial distinction we import by our definition of the word "acceptance."

Sundt succeeds in showing that there are two plausible readings of the statutory history and text. We do not interpret the provision in a vacuum, however, and Sundt cannot adequately explain how its interpretation squares with (1) the conspicuous absence of California cases applying the provision outside the context of civic improvements (even after the amendment), (2) the passages from Miller & Starr and Acret quoted above, and (3) the lack of a textual hook for its distinction between routine and nonroutine approvals. We therefore conclude that approval of a private work constitutes public acceptance only if it results in assumption of some interest in a civic improvement by the public. The interest need not be fee simple; it may be only consent to a particular public use or even just "a continuing [public] concern in [the improvement's] installation and maintenance as it affects other

properties and governmental functions." *Deason,* 2 Cal.App.3d at 752, 83 Cal.Rptr. 105. But mere approval by a public official, whether routine or nonroutine, is not enough.[3]

■ 4. Applying these principles, we hold that Sundt's work of improvement was not subject to acceptance by either the TRPA or the Agency. California law tells us to consider in most cases the "scheme of improvement as a whole." Cal. Civ. Code § 3106. If a person contracts separately to build a particular site improvement, it is considered a separate work of improvement and is analyzed on its own. *See* Cal. Civ.Code § 3135. But Sundt was the general contractor, and the site work it did was part of its overall contract with El Dorado. We thus consider the entire planned redevelopment project rather than merely the site work Sundt did before El Dorado declared bankruptcy.

TRPA approval clearly is not public acceptance. It does not differ materially from the sort of "inspection and approval or the issuance of certificates of occupancy under building regulations" that *Deason* explicitly excluded from section 3086. 2 Cal.App.3d at 751, 83 Cal.Rptr. 105. Although the TRPA regulates heavy-handedly, its requirements apply generally to all construction in the Lake Tahoe region, regardless of civic or noncivic character. Its approvals do not result in acceptance of any public interest in the property inspected.

The certificate of completion provision in the Agreement with the Agency requires

closer analysis. Some aspects of the work of improvement are clearly civic. One provision of the Agreement, for example, requires El Dorado to convey to the Agency free and clear title to the view corridor after clearing it of all improvements other than surface parking; another requires it to dedicate the marina to public use, subject to reservations, after enlarging it and building a restaurant. These two elements of the project are unquestionably civic because the Agreement explicitly calls for a transfer of interest to the public.

Nonetheless, the existence of some civic elements does not make the work of improvement *as a whole* subject to acceptance. Many elements of the project—notably, the luxury hotel—are manifestly not the sort of civic improvement traditionally associated with public dedication. The Agreement does not confer any right in these structures to the public, nor does it impose any requirement of public maintenance. State cases applying the public acceptance requirement have typically involved subdivision developments where the *entire* work of improvement was subject to public acceptance, not merely some portion of it. *See, e.g., Deason,* 2 Cal.App.3d at 752–53, 83 Cal.Rptr. 105 (site improvement built under a separate contract).

The certificate of completion provision applies broadly to all aspects of El Dorado's contract performance, not merely the marina and view corridor. It specifies no particular means for ascertaining whether the project was completed "in full compli-

---

**3.** An acceptance requirement must also satisfy *Deason's* "legislative enactment" test. We confess some difficulty understanding where this test comes from or exactly what it means. It is unclear why a city engineer's administration of a municipal subdivision ordinance is "base[d] in some legislative enactment," *Deason,* 2 Cal.App.3d at 751, 83 Cal.Rptr. 105, while a building official's administration of a municipal building code ordinance, *cf. id.* at 749, 83 Cal.Rptr. 105, is not. *Deason* was trying to prevent the public acceptance exception from swallowing the rule, but it would seem sufficient to have observed that building officials do not accept the works they approve. Nevertheless, *Deason* is settled law, and we follow it.

ance with the terms" of the Agreement (such as inspection by a city engineer), further obscuring any implication that the requirement's purpose is to accept a public interest in the project rather than merely to ensure contract performance generally.

The redevelopment project would no doubt have had *some* incidental public benefit. That the Agency was so involved suggests the City recognized the many public benefits of redevelopment. But public support of a project does not translate to assumption of a continuing public interest in it. A city does not accept a project merely by giving financial incentives to its developer and reserving approval authority to make sure the city's money was well spent. The key to public acceptance is the acquisition of some public interest in the property developed, typically in the context of a subdivision development. Private property with incidental public benefits is not civic property; a luxury hotel is not comparable to a public street, sidewalk, gutter or storm drain—improvements in which the public actually acquires some interest.

Sundt's work of improvement was not subject to public acceptance. Its lien was therefore untimely, and the bankruptcy court correctly ruled for Dynamic.

**AFFIRMED.**