**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>MARIA TERESA MELENDEZ REY,<br>               Debtor. | BAP No. CC-23-1120-SGC<br><br>Bk. No. 2:22-bk-14119-WB |
| MARIA TERESA MELENDEZ REY,<br>               Appellant,<br>v.<br>PETER URQUIJO,<br>               Appellee. | **OPINION** |

Appeal from the United States Bankruptcy Court
for the Central District of California
Julia Wagner Brand, Bankruptcy Judge, Presiding

APPEARANCES

Christopher J. Langley of Shioda, Langley & Chang LLP argued for
Appellant; Thomas H. Casey argued for Appellee.

Before: SPRAKER, GAN, and CORBIT, Bankruptcy Judges.

Opinion by Judge Spraker
Concurrence by Judge Corbit

SPRAKER, Bankruptcy Judge:

## INTRODUCTION

Chapter 13[1] debtor Maria Teresa Melendez Rey appeals from the bankruptcy court's order sustaining the objection of creditor Peter Urquijo to Rey's homestead exemption claim. Her appeal presents a single legal issue: when the real property in question includes two separate residential structures, one of which is the debtor's residence and the other is a rental property, does California consider the two structures as a single unit for purposes of applying its homestead exemption? We answer this question in negative. Because Rey has not presented any other grounds to justify reversal of the order on appeal, we AFFIRM.

## FACTS[2]

### A. Rey's bankruptcy filing and her homestead exemption claim.

The relevant facts are undisputed.[3] Rey filed for relief under chapter 7 in July 2022. The court later granted Rey's motion to convert to chapter 13, subject to reconversion to chapter 7 if Rey should fail to successfully complete her chapter 13 case.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[3] Because Rey has not disputed any factual findings on appeal, our recitation of facts draws heavily from the bankruptcy court's statement of facts contained in its memorandum decision disposing of Urquijo's exemption objection.

On her Schedule A/B, Rey listed her fee simple interest in 1922-1924 Bunker Ave ("Property"). Rey valued the Property at $930,000. In the operative version of her schedules, she described the Property as: "Two houses on parcel, front house is 920sq/ft, 1 bd plus den where debtor resides. Back house is 2,300 sq/ft, 6 bd and 3 bath, currently rented to two sisters. Property purchased in 1987." Rey listed $583,518 in secured debt against the Property owed to one creditor. In her Schedule C, she claimed a homestead exemption in the Property for $626,400 based on the maximum statutory amount set forth in California Code of Civil Procedure ("CCP") § 704.730(a)(1), as adjusted for inflation pursuant to CCP § 704.730(b).[4]

Rey listed Urquijo in her schedules as a disputed, contingent, and unliquidated unsecured creditor for $494,000 in attorney fees. Urquijo filed an unsecured proof of claim for $511,968.80.

B.     **Urquijo's objection to Rey's claimed homestead exemption.**

Urquijo objected to Rey's homestead exemption of the Property on the basis that it did not extend to the rented duplex. He conceded that Rey had resided in the smaller house at 1922 Bunker Avenue since 2017 and was continuing to reside there at the time of her bankruptcy filing. But he maintained that the six-bedroom duplex at 1924 Bunker Avenue had been constructed and always used as a rental property. In fact, he pointed out that each unit in the duplex had been rented out to the same two tenants

---

[4] This is the maximum statutory amount of the homestead exemption rather than the equity under the debtor's valuation.

since at least 2020, that Rey had not even entered the duplex since 2020, and that the terms of her lease with the tenants prohibited her from entering the duplex unless she gave advance written notice.

In addition to having separate addresses, the two structures are separated by a fence and have separate driveways, entrances, parking, utilities, and mailboxes. As Urquijo put it, the only things the structures had in common besides ownership were a single assessor's parcel number, and a mortgage encumbering the entire Property. Based on these facts, Urquijo contended that Rey had a right to claim only 1922 Bunker Avenue as her residence and her homestead. The rental duplex at 1924 Bunker Avenue, he insisted, was not her residence and did not qualify for the automatic residential homestead exemption.[5]

In support of his objection, Urquijo submitted two appraisals—one appraising 1922 Bunker Avenue and the other appraising 1924 Bunker Avenue. The appraisals separately valued the structures and concluded that 1922 Bunker Avenue had a fair market value of $574,000 and 1924 Bunker Avenue had a fair market value of $830,000.

Rey's opposition to Urquijo's objection focused on the fact that the structures were situated on a single lot of land subject to a single assessor's

---

[5] Urquijo's objection also discusses a separate garage structure, consisting of two two-car garages separated by a wall but sharing a common roof. Though Rey used half of the garage space for personal storage, one of Rey's tenants leased and used the other half of the garage space. Consequently, Urquijo asserted that Rey could claim as exempt only 50% of the garage space.

parcel number. Because it was undisputed that she resided in the house at 1922 Bunker Avenue, she maintained that she was entitled to the automatic homestead exemption as to the whole of the Property. According to Rey, the structures only could be sold as a single unit under current California real property law. Therefore, she reasoned that it made no sense to separately evaluate the structures in the process of determining whether each individual structure qualified as part of her residence. Rather, she maintained that the duplex and garage were "outbuildings" or "appurtenances" that were part of her homestead regardless of the actual use of those structures. She further argued that Urquijo relied on outdated case law that was no longer applicable to a single lot. Instead, Rey insisted that the entire lot was indivisible and exempt as her homestead.[6]

Urquijo replied that Rey was attempting to expand the statutory scope of the homestead to include all outbuildings and appurtenances adjacent to the residence and the land on which they are situated. Urquijo maintained that California case law had clarified that the inclusion of outbuildings and land in the homestead was limited to those actual and customary appurtenances necessary or convenient for personal household

---

[6] Rey also challenged Urquijo's two separate appraisals as defective because they incorrectly assumed that the two structures could be sold separately, and each had its own separate fair market value. Rey posited that the two appraisals grossly inflated the fair market value of each structure. The bankruptcy court made no determination as to the value of the Property. The value, either as a single unit or as broken down between 1922 Bunker Avenue and 1924 Bunker Avenue, is largely irrelevant to the bankruptcy court's decision.

use and enjoyment. Urquijo opined that whether the structures only could be sold as part of a single legal plot of land was irrelevant to the exemption issue.[7] As for the appraisals, he maintained that they demonstrated the hypothetical value a chapter 7 trustee could receive by selling the two residential structures for purposes of determining whether the proposed chapter 13 plan satisfied the liquidation analysis required under § 1325(a)(4).[8] Based on his appraisals Urquijo stated that such sales would net unsecured creditors roughly $361,250.00 under his liquidation analysis.

## C. The bankruptcy court's ruling on the exemption objection.

After holding a hearing on the exemption objection, the bankruptcy court entered a memorandum decision and an order sustaining the objection. The court largely relied on Urquijo's statement of the undisputed facts and his view of California homestead exemption law. The court specifically rejected Rey's argument that California homestead exemption law necessarily required the two separate structures to be treated as a single unit because they both were part of a single legal plot of land.

The bankruptcy court entered its order sustaining the exemption objection on June 30, 2023. Rey timely appealed.

---

[7] Urquijo further suggested that recent California legislation permits under certain circumstances for homeowners to divide a single residential lot into two roughly equal portions. The bankruptcy court did not address this issue. Nor is it relevant to our analysis and resolution of this appeal.

[8] Again, this issue was not addressed by the bankruptcy court and is beyond the scope of this appeal from the order sustaining Urquijo's exemption objection.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether California homestead exemption law requires a court to determine the homestead nature of multiple structures as a single indivisible unit when all of those structures are situated on a single plot of land subject to a single assessor's parcel number.

## STANDARD OF REVIEW

The sole issue properly raised by Rey requires us to interpret California homestead exemption law. Though some homestead exemption appeals present both questions of fact and law, *see, e.g., Bhangoo v. Engs Com. Fin. Co. (In re Bhangoo)*, 634 B.R. 80, 90 (9th Cir. BAP 2021), Rey's issue is a pure question of law, which we review de novo, s*ee Elliott v. Weil (In re Elliott)*, 523 B.R. 188, 195-96 (9th Cir. BAP 2014).

## DISCUSSION

### A.    California's automatic homestead exemption—generally.

California has opted out of the slate of federal exemptions set forth in the Bankruptcy Code. *See* § 522(b); CCP § 703.130. Thus, Rey's right to claim an exemption is governed by California law. *McKee v. Anderson (In re McKee)*, 90 F.4th 1244, 1247 (9th Cir. 2024); *In re Elliott,* 523 B.R. at 192. Rey claims California's automatic homestead exemption as set forth in CCP § 704.710, *et seq*. The automatic homestead exemption is one of two

7

partially overlapping homestead exemptions available under California law.[9] *Amin v. Khazindar*, 112 Cal. App. 4th 582, 588 & n.2 (2003); Harry D. Miller and Marvin B. Starr, 12 Cal. Real Est. § 43:1 (4th ed. 2023). At the time Rey filed her bankruptcy, the maximum statutory homestead exemption available, as adjusted for inflation was $626,400. CCP § 704.730(a)(1), (b).

## B. Focus on use.

The automatic homestead exemption is rooted in the statutory definitions of "homestead" and "dwelling." The statute defines a homestead as "the principal dwelling (1) in which the judgment debtor . . . resided on the date the judgment creditor's lien attached to the dwelling, and (2) in which the judgment debtor . . . resided continuously thereafter until the date of the court determination that the dwelling is a homestead." CCP § 704.710(c). In turn, a "dwelling" for purposes of the

---

[9] As *Amin* explained:

> In California, a homestead exemption may be asserted two ways. First, a declaration of homestead may be recorded. A recorded homestead protects the property from execution by certain creditors to the extent of the amount of the homestead exemption. Because many California debtors failed to file homestead exemptions, the legislature in 1974 enacted legislation which created an "automatic" homestead exemption. This exemption need not be memorialized in a recorded homestead declaration in order to be effective.

*Amin*, 112 Cal. App. 4th at 588 (cleaned up); *see also Webb v. Trippet,* 235 Cal. App. 3d 647, 651 (1991) ("An automatic residential exemption applies when a party has continuously resided in a dwelling from the time that a creditor's lien attaches until a court's determination that the exemption applies.").

homestead exemption is defined to mean "a place where a person resides and **may** include but is not limited to . . . [a] house together with the outbuildings and the land upon which they are situated."[10] CCP § 704.710(a)(1) (emphasis added). Based on the statutory definition of dwelling, California has not strictly limited the homestead exemption to the dwelling house in which the family resides but also has included "the usual and customary appurtenances, including outbuildings of every kind **necessary or convenient for family use and lands used for the purposes thereof**." *Gregg v. Bostwick*, 33 Cal. 220, 227 (1867) (emphasis added).

In *Gregg,* the debtors claimed a homestead exemption by declaration in a block of real property comprised of four lots. *Id.* at 221. They resided on one of these lots. The other lots included six other dwelling houses and other buildings used for various purposes. The buildings were occupied by tenants and separated from the debtors' residence by fences. *Id.* at 222. Construing the contours of the property subject to California's homestead exemption, the California Supreme Court explained that "the only tests are use and value. The former is both abstract and statutory – the latter statutory only." *Gregg,* 33 Cal. at 228. As to the critical importance of a debtor's use in determining the homestead, the *Gregg* court further explained:

---

[10] CCP 704.710(a) sets forth a non-exhaustive laundry list of other types of property the term "dwelling" may include. The only item in the laundry list relevant to this appeal is the first one set forth in subsection (1) regarding the house, outbuildings, and underlying land.

> Whatever is used--being either necessary or convenient--as a place of residence for the family as contradistinguished from a place of business, constitutes the homestead, subject to the statutory limit as to value. If, however, it is also used as a place of business by the family, which frequently happens, it may not therefore cease to be a homestead, if it would be necessary or convenient for family use **independent of the business.**

*Gregg,* 33 Cal. at 228 (emphasis added). In *Bond v. CIT Group/Sales Financing, Inc. (In re Bond)*, 2006 WL 6810941, at *5 (9th Cir. BAP Apr. 26, 2006), we recognized that *Gregg* is still good law and observed that "there is no formula for determining the propriety of the use of surrounding property claimed, but it cannot be protected by the homestead if is it neither necessary nor convenient for the enjoyment of the home."

*Gregg* also makes clear that a debtor's use of the property is inherently a factual question:

> How much of Block Eighteen was actually used by the plaintiffs as a homestead at any time prior to 1857 the Court does not find, and it does not follow that they used the entire block for that purpose merely from the fact that they resided upon a part of it, with no fence except upon its exterior lines; for, as we have already stated, the homestead is not measured by fences merely. As fences alone cannot limit the extent of the homestead, neither can they enlarge it. Its extent is measured by use and occupation as such, and not by imaginary or artificial lines.

*Gregg*, 33 Cal. at 228-229. Thus, the extent of Rey's homestead exemption ultimately hinges on how she used the Property. *See In re Bond*, 2006 WL

6810941, at *6; *Guernsey v. Douglas*, 171 Cal. 329, 331 (1915); *Payne v. Cummings*, 146 Cal. 426, 430–31 (1905); *In re Ligget*, 117 Cal. 352, 352–53, (1897); *Arendt v. Mace*, 76 Cal. 315, 316–17 (1888); *Vincenzini v. Fiorentini*, 2 Cal. App. 2d 739, 740–42 (1934); *Lorenz v. Hunt*, 91 Cal. App. 78, 83–84 (1928); *see also* 12 Cal. Real Est. § 43:23.[11]

## C.  Rey's arguments.

### 1.  Statutory construction argument.

Rey concedes that she has used the 1924 Bunker Avenue duplex exclusively as a rental. She has never resided in the duplex. Nor has she claimed any intent to do so.[12] Instead, Rey argues that the duplex is part of her homestead because it is situated on a single legal plot of land and, therefore, is indivisible for both sale and homestead purposes. She claims that this necessarily follows from the statutory inclusion of outbuildings and the land on which those structures are situated in the definition of "dwelling." CCP § 704.710(a)(1). In her view, no part of the single legal plot of land on which her house is situated can be evaluated separately under California homestead law because it remains the land on which her

---

[11] As the Miller and Starr treatise explains, though most of the California decisions that have considered the amount of property covered by the homestead exemption have been declared-homestead cases, the automatic homestead exemption should afford the same amount of protection "for interests in mixed use or excess property." 12 Cal. Real Est. § 43:17. Rey has not argued otherwise. Therefore, we consider ourselves bound by the declared-homestead caselaw for purposes of considering the amount of property protected by the automatic homestead exemption.

[12] In fact, under her current rental agreements with her tenants, she could not even enter the duplex without providing them with advance written notice.

residence is situated.

In making this argument, Rey misconstrues the statutory definition of dwelling. She ignores the use of the permissive phrase that a dwelling "may include" the outbuildings and land on which it is situated. Instead, she substitutes a nonexistent mandatory term that the dwelling "must" include all outbuildings situated on the same land. Her argument is inconsistent with *Gregg* and roughly 150 years of California case law evaluating the extent of the homestead exemption applicable to multiple structures. Regardless of whether those structures are situated on one or more lots, courts have engaged in a fact-intensive investigation focusing on how the debtor actually has used the structures and the land on which they are situated. *Compare Lubbock v. McMann*, 82 Cal. 226, 229 (1889) (single lot); *Maloney v. Hefer*, 75 Cal. 422, 424–25 (1888) (same); *and Bodden v. Cmty. Nat'l Bank*, 271 Cal. App. 2d 432 (1969) (same); *with Guernsey*, 171 Cal. at 331 (multiple lots); *In re Ligget*, 117 Cal. at 352–53, (1897) (same); and *Gregg*, 33 Cal. at 227 (same).

2. **Argument based on California case law.**

a. *In re Estate of Schmelz.*

Rey primarily relies on *Schmelz v. Schmelz (In re Estate of Schmelz)*, 259 Cal. App. 2d 440 (1968). There, the California Court of Appeal held that a single lot with two houses and a six-unit apartment structure would be treated in its entirety as the widow's probate homestead. *Id.* at 442, 444-

12

46.[13] But *Schmelz* explained at length that, but for the parties' stipulation that the property could not be divided for homestead purposes, it would have been an abuse of discretion for the superior court to find that the entire parcel was the widow's homestead. *Id*. at 444-45.[14] As *Schmelz* pointed out, in all other homestead cases it found (both probate and non-probate), there were none in which the appellate court determined that the homestead "was properly impressed upon [the entire] piece of property where there are multiple dwellings, each or any of which is complete as a proper residence for homestead purposes." *Id.* at 444.

*Schmelz* does not help Rey. In fact, it supports the bankruptcy court's decision. It was only the stipulated indivisible nature of the multiple dwellings in *Schmelz* which permitted the superior court to find that they all as a single unit qualified as the widow's homestead. *Schmelz* reasoned that this indivisibility rendered the widow's multiple dwelling structures akin to those cases assessing a single dwelling structure containing multiple residential units. Relying on California Supreme Court authority,

---

[13] Rey's reliance on *Schmelz*—a probate homestead case—is somewhat ironic. Elsewhere in her briefing, she complains that the bankruptcy court should not have relied on probate homestead cases. Without explaining why, she suggests that such cases are inapt for purposes of determining the amount of property properly comprising the homestead in non-probate cases. We are not aware of any meaningful analytical distinction for purposes of determining the extent or amount of the claimed homestead. In fact, *Schmelz* itself relied on both probate and non-probate cases in analyzing the extent of the widow's probate homestead. *Id.* at 444-45.

[14] *Schmelz* never states the converse proposition: that it would have been an abuse of discretion if the superior court had found only some but not all of the dwelling structures on the lot qualified as the widow's homestead.

13

*Schmelz* noted that there is an "obvious" distinction between homestead cases involving multiple dwellings on a single parcel of land and those involving a single, multi-unit dwelling. *Id.* at 445 (citing *Rosenblum v. Levy (In re Est. of Levy)*, 141 Cal. 646, 651 (1904)). As *Schmelz* further observed:

> While [the homestead] definition may include . . . the land on which the dwelling-house stands and . . . also such other land as may be necessary to its convenient use and occupation, it does not, when fairly construed with a view to the objects of the homestead law, include such other land as has resting thereon, as a part thereof, a building or buildings devoted to other purposes than those of a family home.

*Id.* at 445 (quoting *In re Est. of Levy*, 141 Cal. at 651).

### b. *In re Jarrell*.

Rey also relies on *In re Jarrell*, 34 F. 2d 970 (S.D. Cal. 1929), in which the parcel in question included four houses built straddling several different lots of land. *Id.* at 972-73. Rey points out that *Jarrell* held that the parcel could not be divided for homestead purposes. *Id.* at 974. *Jarrell* involved four houses; the debtor resided in one and rented the other three. The court assessed the homestead nature of the parcel as a single unit even though only one of the four houses was used as the debtor's residence. *Id.* at 975. According to *Jarrell* the use of the other houses as rentals was incidental to the homestead purpose of the entire parcel. *Id.* at 975 ("The bankrupt and his family use all the premises in controversy, and **all of the property is necessary and convenient for the use of the bankrupt and his family as a place of residence, independent of the smaller residences**

**upon said property which are rental properties**." (Emphasis added.)) However, the *Jarrell* court based its determination that the entire parcel was indivisible for homestead purposes on its finding that the entire parcel was covered by lawns, gardens, and "pagodas" that were part of debtor's residence. *Id.* at 974.

*Jarrell* appears out of step with the California precedent we rely on above. But even if we assume that *Jarrell* can be reconciled with that precedent and represents good California law, it does not establish error. Rather, *Jarrell* merely stands for the proposition that whether rental structures situated on the same land as the debtor's residence are part of the homestead is a question of fact. *See generally Gregg*, 33 Cal. at 228-29 (identifying issue of extent of homestead as an inherently factual question based on how the property is actually used). *Jarrell* held that as a matter of fact the debtor's use of the property established that the rental buildings were incidental to, and part of, the debtor's dwelling. But the record here stands in stark contrast as the undisputed facts established that Rey has always rented the duplex, which is distinct and separate from Rey's residence. Both enjoy separate driveways, entrances, parking, utilities, landscaping, and mailboxes—and were separated by a fence.

### 3. Division and sale of legal lots.

Rey claims that her duplex must be considered part of her dwelling for purposes of determining her homestead because it is situated on the same legal lot as her residence. She argues, therefore, that the duplex

cannot be sold separately.[15] She points to California's Subdivision Map Act, California Government Code § 66410, *et seq.*, as restricting the division and sale of existing legal lots of land.[16] She further posits that the inability to sell the house and the duplex separately would prevent a judgment

_____

[15] Urquijo has disputed this point, claiming that it might be possible for the house and the duplex to be sold separately. We express no opinion on this issue. The sale of any portion of the Property is speculative, was not before the bankruptcy court, and is beyond the scope of this appeal.

[16] "The Subdivision Map Act is a statutory scheme regulating subdivision approvals and land use planning by local governments. The Act is designed to promote orderly community developments and involves an application process that culminates in public hearings to determine whether a subdivision map will be approved." *Cnty. of Marin v. Martha Co.*, 2018 WL 5279583, at *5 (N.D. Cal. July 6, 2018) (cleaned up). Rey describes the impact of the Subdivision Map Act on parcels of real property as follows:

> Up until Feb. 1, 1972, anyone wishing to divide a property into four or fewer parcels could simply deed that portion to the buyer. As soon as a new deed was recorded, that portion forever became a separate legal lot of record. It could be used or developed the same as any other lot with similar zoning. A person could create up to four parcels in this manner; assuming they complied with the minimum lot size requirements as they were conveyed.
>
> In 1972, however, this situation changed with adoption of the State Map Act, which went into effect on February 1, 1972, and from that date forward the only way to create new lots was through approval of a subdivision map. While many lots divided by deed prior to that time were (and are) recognized as legal lots, properties could no longer be divided by deed. Properties, anyone wishing to split a lot or sell off a portion of property, would then be required to go through a formal subdivision process or boundary adjustment process.

Aplt. Opn. Br. at 19 & n.6 (quoting "An Assessor's Parcel may not be a Legal Lot," Cnty. of San Diego Planning and Dev. Servs. Notice PDS-358 (revised Mar. 8, 2022), *available at* https://www.sandiegocounty.gov/content/dam/sdc/pds/zoning/formfields/PDS-PLN-358.pdf (last visited March 29, 2024)).

creditor from being able to comply with California's enforcement of judgment procedures for obtaining an order authorizing the forced sale of the house. Aplt. Opn. Br. at 26 (citing CCP § 704.780(b)). According to her, these procedures require the judgment creditor seeking to force the sale of the homestead to prove its fair market value. *Id.*[17] As Rey reasons, there is no way to prove the fair market value of her house by itself because it cannot legally be sold by itself. *Id.* at 26-27 (citing CCP § 1263.320). She concludes that this necessarily means the entire Property is indivisible for purposes of the determining the extent of her homestead exemption.[18]

Though clever, this argument is not supported by California case law,

---

[17] In relevant part, CCP § 704.780(b) provides that:

> The court shall determine whether the dwelling is exempt. If the court determines that the dwelling is exempt, the court shall determine the amount of the homestead exemption and the fair market value of the dwelling. The court shall make an order for sale of the dwelling subject to the homestead exemption, unless the court determines that the sale of the dwelling would not be likely to produce a bid sufficient to satisfy any part of the amount due on the judgment . . . .

[18] As Rey puts it:

> The necessity of determining a fair market value is critical to this appeal . . . . A California case could not support the severability of the homestead exemption as the bankruptcy court has done because such decision would be inconsistent with these California statutory provisions regarding fair market value. When that impossibility is coupled with the policy to construe homestead exemptions broadly in favor of debtors, the only logical deduction is this ruling is not supported by California case law.

Aplt. Opn. Br. at 30.

and we simply do not find it persuasive. California cases uniformly have focused on the debtor's use of property to determine whether it is a single dwelling for purposes of the homestead exemption. *See, e.g, Wagner v. Ulrich,* 204 Cal. 452, 452–53 (1928); *In re Ligget*, 117 Cal. at 352–53; *Maloney*, 75 Cal. at 424–25; *Gregg,* 33 Cal. at 228-29. To the extent Rey is correct about the effect of the Subdivision Map Act on some forced sales of homesteads by judgment creditors, it is a problem best addressed by the California legislature.

Rey insists that the bankruptcy court was required to focus on the inability to sell the two structures separately. Rey would have us treat her homestead exemption as if it were an interest in the real property that outright prohibited its sale. This is incorrect. It is true that CCP §§ 704.780 and 704.800 only permit sale of the subject property when the sale of that property will yield sufficient proceeds "to pay out all encumbrances on the property and the debtor's homestead exemption in full." *In re McKee*, 90 F.4th at 1247. Yet the principal attribute of a California automatic homestead exemption is the preservation for the judgment debtor of a specific amount of **value** in the real property's equity, if any, up to the statutory ceiling. *See Wells Fargo Fin. Leasing, Inc. v. D & M Cabinets*, 177 Cal. App. 4th 59, 68 (2009) ("A homestead exemption does not preclude sale of the home but entitles the homesteader to receive the value of the exemption if the property is sold to satisfy a judgment lien."); *see also Hyman v. Plotkin (In re Hyman)*, 967 F.2d 1316, 1318 (9th Cir. 1992) (noting

that the homestead statutes effectively define "homestead exemption" as "a fixed dollar amount generated from the sale of the homestead"); *Stohlman & Rogers, Inc. v. Anderson (In re Anderson)*, 2006 WL 6810946, at *3 (9th Cir. BAP Aug. 9, 2006) (stating that "neither type of [California] homestead exemption wholly prevents a forced sale; rather, the exemption protects a portion of the proceeds").

The question here is the scope of the allowed homestead exemption. Under well established California precedent, that exemption is limited by use and value. The objection to the exemption focuses on use not value. The bankruptcy court held that Rey's homestead exemption was limited to the structure and land that she used as her residence and did not extend to the duplex that she has separated and used as rental property. Rey owns the Property, which has not been divided. But the absence of any division, or even the indivisibility of the property, does not expand or contract the applicable exemption. In short, we reject Rey's argument based on the alleged indivisibility of her Property for sale purposes as fundamentally inconsistent with California homestead exemption law.

### 4. Economic necessity argument.

Rey also argues that the duplex is necessary and convenient for her household use because she depends on the rents to pay debt secured by the Property. Without the duplex, she argues, she would not be able to reside in her house. Rey did not argue in the bankruptcy court that the rent she collected was economically essential to her ability to pay her mortgage.

19

Nor did she present any evidence to this effect as part of her response to Urquijo's exemption objection. On appeal, she baldly assumes this fact to be true. We decline to address this factual issue for this first time on appeal. *See Oyama v. Sheehan (In re Sheehan)*, 253 F.3d 507, 512 n.5 (9th Cir. 2001).

Even assuming that Rey depends on the rental of the duplex to make her mortgage payments on the Property, this does not transform the duplex into her dwelling for purposes of the homestead exemption. Rey cites *Bodden,* 271 Cal. App. 2d at 432, and *In re Shepardson*, 28 F. 2d 353 (S.D. Cal. 1928) in support of her economic necessity argument. A careful reading of these decisions reveals that they provide insufficient support for her argument. Like *Jarrell*, the *Bodden* court held that it would treat the entirety of the claimed homestead land as one unit based on factual findings that the debtor used the entire property for household purposes:

> [T]he occupants of both houses make use of the entire lot. The distance between the back of the front house and the front of the rear house is 29 feet, and there is no fence or other physical object dividing the front and rear houses unless it would be two spruce trees that grow in the space between them. Respondent's clothes line is located partly alongside the rear house on the back part of the lot, and trash and other waste material is carried across the rear lot and stacked at the back of the property. A picnic table located between the two houses is used by both respondent and her tenants.

*Bodden*, 271 Cal. App. 2d at 434. The *Bodden* court further noted that access to the rear house only could be accomplished by crossing over the land appurtenant to the front house. In contrast, as noted by the bankruptcy

20

court, Rey's house and the duplex enjoyed separate driveways, entrances, parking, utilities, landscaping, and mailboxes—and were separated by a fence.[19]

In *Shepardson*, the debtor filed a declaration claiming 10 acres of land as her homestead. The debtor resided on the property, but also operated a country store, a gas station, and had nine small cabins often rented to travelers. *In re Shepardson*, 28 F.2d at 354. The bankruptcy referee found that the entire property was primarily used as the debtor's residence and that the business use of some the structures "was incidental and subordinate to the use by the bankrupt and her family of said premises for a home, and that the entire premises were impressed with the homestead." *Id.* at 354-55.

---

[19] The *Bodden* court found that excluding the rental house from the debtor's homestead exemption "would deprive respondent of this means of preserving her homestead." *Id.* at 435. If evidence had been presented to support an economic necessity justification like that relied on in *Bodden* and the bankruptcy court had made such a factual finding, we may have been hard pressed to articulate a justification for reversal. At the same time, *Bodden* explicitly extended the economic necessity justification from *Phelps v. Loop*, 64 Cal. App. 2d 332 (1944), which was a homestead case involving **a single dwelling structure** as opposed to the **two separate dwelling structures** involved in *Bodden*. As we indicated above citing *Levy* and *Schmelz*, the California Supreme court has long recognized a critical distinction in homestead cases between single and multiple dwelling structures. *See In re Est. of Levy*, 141 Cal. at 651; *see also In re Est. of Schmelz*, 259 Cal. App. 2d at 445. As a result, it is difficult to predict that the California Supreme Court ultimately will depart from its view expressed in *Levy* regarding the "obvious" distinction between single and multiple dwelling structure cases, and instead will follow *Bodden*'s pronouncement that it saw "no valid reason for distinguishing" a homestead property with a single dwelling from those with multiple dwellings. *Bodden*, 271 Cal. App. 2d at 435. In any event, *Bodden* does not appear to require, so much as permit, a finding that the rental was incidental to the entire property's use as a homestead based on economic necessity.

In the process of upholding the referee's decision, *Shepardson* was careful to note that cases concerning "the quantity of land to be deemed appurtenant and necessary to the use of the dwelling house" turn on the facts and circumstances of the specific case and how the claimed property is situated and actually used: "that matter has been regulated for the most part by considering the character of the ground and its location, whether in a thickly settled section, as city lots, or in rural locations, where agricultural pursuits are common, and it is said that each case must be determined upon its own facts." *Id.* at 355.

As the above discussion demonstrates, a handful of decisions have held that all structures on a multiple-dwelling parcel were incidental to the debtor's residence based on the facts of those cases. These cases are the exception to the general rule in California, which assesses the homestead character of multiple dwellings on the claimed homestead separately. Absent unusual circumstances, California treats separate dwellings not used as the debtor's residence as not part of the debtor's homestead. *See In re Est. of Schmelz.*, 259 Cal. App. 2d at 444-45; *Lubbock*, 82 Cal. at 229 (following general rule); *Maloney*, 75 Cal. at 424–25 (same). As *Maloney* aptly held, when only one of two houses on a single lot is used as a family's homestead, the house not so used "forms no part of the homestead claim, in the sense of the statute." *Id.* at 424.[20] Based on the record presented to the

---

[20] Rey cites a number of cases involving a multiple-unit dwelling structure and found that the single structure qualified in its entirety as the debtor's homestead. *See,*

bankruptcy court, it did not err by applying the general rule separately assessing the homestead character of the two dwellings on Rey's Property.

**5.    Policy arguments.**

Finally, Rey relies on policy arguments to support her claim that the homestead character of the dwellings on the Property must be assessed as a single unit. She points out that the homestead statutes must be liberally construed. *Amin,* 112 Cal. App. 4th at 588. Liberal construction of the statutes serves to effectuate the statute's goal of helping to prevent Californians from losing their homes through hyper-technical interpretation. *Canino v. Bleau (In re Canino)*, 185 B.R. 584, 590 (9th Cir. BAP 1995). "However, liberal construction in favor of the debtor does not give a court license to rewrite the statutory language." *Id.* (citing *Seror v. Kahan (In re Kahan)*, 28 F.3d 79, 83 (9th Cir. 1994)). Nor does it permit us to ignore roughly 150 years of California precedent.

Finally, Rey contends that there is a strong policy in California to enact and facilitate laws that encourage homeowners to improve their properties to include "Accessory Dwelling Units" ("ADUs").[21] According

---

*e.g., In re Est. of Levy*, 141 Cal. at 651-53; *Nelson v. King (In re Nelson's Est.)*, 224 Cal App. 2d 138, 144-45 (1964), *superseded by statute on other grounds as stated by Benson v. Benson*, 36 Cal. 4th 1096, 1107-08 (2005); *Oppenheim v. Goodley*, 148 Cal App. 2d 325, 330 (1957); *Phelps,* 64 Cal. App. 2d at 333-34. But binding California case law clearly distinguishes between the multiple dwelling structures and the single, multi-unit dwelling scenario. *In re Est. of Levy*, 141 Cal. at 651 ("The distinction between [the multiple dwelling] cases and the case of a single building is obvious."). Rey has not presented any persuasive reason to depart from this precedent.

[21] Cal. Gov't Code § 65852.2(j)(1) defines the term "Accessory dwelling unit" as,

to Rey, this policy—meant to combat the scarcity of affordable housing in California—is reflected in the 2021 enactment of laws providing for nondiscretionary, ministerial approval of applications to construct an ADU on property otherwise zoned only for single family residences. Aplt. Opn. Br. at 33 (citing Cal. Gov't Code §§ 65852.21, 66411.7). Rey maintains that this policy is undermined by the bankruptcy court's ruling that it was permissible to assess the homestead character of multiple dwellings on a single legal lot individually rather than as a single unit.

Rey posits that the bankruptcy court's decision, unless reversed, will chill homeowners from building ADUs because homeowners might not be able to invoke the homestead exemption to protect the value of the ADU if it is separately assessed as not part of the homestead. This supposition is entirely speculative. But to the extent there is any such concern, it does not permit us to rewrite California's homestead laws or interpret them any differently than the California courts have long interpreted them. The carefully crafted balancing of debtors' and creditors' rights reflected in the statutes and the case law is best altered, if necessary, by the California legislature.

---

"an attached or a detached residential dwelling unit that provides complete independent living facilities for one or more persons and is located on a lot with a proposed or existing primary residence." The statute further identifies two additional types of residential structures that can qualify as ADUs, neither of which is relevant here.

## CONCLUSION

For the reasons set forth above, we AFFIRM.

Concurrence begins on next page.

CORBIT, Bankruptcy Judge, concurring:

As correctly stated by my colleagues, the controlling cases from the California Supreme Court, which date back to the 1800s, hold that a homestead in California is limited to only the structures that a debtor uses, *Gregg*, 33 Cal. at 229, even if it is necessary to divide one lot because the debtor lives in and uses only one of two houses on a lot, *Maloney*, 75 Cal. at 424-25. Accordingly, I join in the above opinion.[1]

However, unlike in the 1800s, single family lots are no longer easily divided for sale and in some instances cannot be divided.[2] Moreover, now California residents are encouraged to build Accessory Dwelling Units ("ADUs").[3]  As a result, given all the changes over the past 150 years, I write separately to emphasize the need for the California legislature to

---

[1] The outcome may not be the same if a homestead statute from a state without similar historic precedents was being reviewed.

[2] After the California Supreme Court's 1867 decision in *Gregg* and the 1888 decision in *Maloney*, the California legislature enacted its first subdivision map statue with statewide effect in 1893. *See Gardner v. Cnty. of Sonoma*, 29 Cal. 4th 990, 995-96 (2003). Further, the law regarding subdivisions has continued to evolve to the point where the Appellant argues that her residence cannot be legally divided from the rented duplex on the same lot.

[3] ADUs are independent residences located on the same lot as a single-family house. In 2016, the California legislature passed a pair of statewide bills (A.B. 2299 and S.B. 1069) that required cities and counties to allow ADUs on most residential lots, preempting local zoning ordinances and permitting processes. As the first reforms from 2016 took effect, ADU development in California has rapidly and steadily increased from just over 1,000 ADUs permitted in 2016 to over 24,000 permitted in 2022. *See* Bipartisan Policy Center, "Accessory Dwelling Units (ADUs) in California," https://bipartisanpolicy.org/blog/accessory-dwelling-units-adus-in-california/ last visited March 29, 2024).

address how the California homestead statute applies to debtors who live in only one of the multiple residences on a single lot.