Filed 1/31/25  Schill v. Perera CA2/8
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| GREGORY P. SCHILL,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>LIONEL PERERA et al.,<br><br>     Defendants and Respondents. | B328409<br><br>Los Angeles County<br>Super. Ct. No. BC699640 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kristin S. Escalante, Judge.  Affirmed.

Garrett & Tully, Ryan C. Squire, Adjoa M. Anim-Appiah and Scott B. Mahler for Plaintiff and Appellant.

Law Offices of Jeffrey B. Ellis and Jeffrey B. Ellis for Defendants and Respondents.

_____

Two sets of neighbors disagree about whether easements allow one to prevent the other's residential development.

In 2010, Gregory Schill purchased 5250 Willow Wood Road in the city of Rolling Hills Estates. In this litigation, his property is known as Lot 24.

In 2013, Lionel and Nirmala Perera bought Elkmont Canyon, which is about four vacant acres of very steep land abutting Schill's lot. Although the properties are contiguous, they are in different cities. Schill's land is in Rolling Hills Estates. The Pereras' land is in Rancho Palos Verdes.

The Pereras applied to Rancho Palos Verdes to build a house on part of their Elkmont Canyon property. Schill and some neighbors opposed the Pereras' application, fearing the project would create a risk of erosion and would imperil their homes.

Schill maintained he owned easements giving him the right to block the Pereras' proposed development.

Rancho Palos Verdes refused to adjudicate the easement question but said it would accept a judicial determination.

Schill sued for a declaration that, by law, he possesses these easements. The trial court rejected his claim. We affirm.

I

We sketch today's landscape.

The Pereras' lot is about four acres of undeveloped land, the majority of which is an elongated canyon in Rancho Palos Verdes (the City) known as Elkmont Canyon. The slopes have grades of over 35 percent. On the south and west rims of the canyon are houses in Rancho Palos Verdes. The north side has homes in Rolling Hills Estates, including Schill's.

We trace some history.

Before 1956, there was a common owner of what Schill and the Pereras now own. We call that bygone common owner

2

"Attica." It was an entity composed of various interests we need not detail. It conveyed its interests to a successor.

Attica's successor to the Pereras' land eventually subdivided it, creating the lot the Pereras ultimately purchased. When the successor did so, it abandoned rights of access to Hawthorne Boulevard and Silver Spur Road, which are the only roads next to the property.

Attica's successors conveyed the land that would later be subdivided into lots, including Lot 24, to the McCarthy Company (McCarthy). In September 1956, Attica granted McCarthy a corporation grant deed. This deed included easements over the land Attica retained at the time (including Elkmont Canyon) for the benefit of the land McCarthy now owned (including what is now Schill's lot).

Rider 1 to the corporation grant deed described "an easement for storm drain purposes" that was about 250 feet long and Rider 2 described "an easement for slope purposes" that was about 850 feet long. Each easement covered part of what is now the Pereras' lot.

In October 1956, McCarthy recorded a tract map subdividing its property. In April 1957, Attica granted Rollingwood Homes Company (Rollingwood), a successor to McCarthy, another easement over part of Elkmont Canyon "for slope construction and slope maintenance purposes, together with the right of entry for such purposes." This easement overlaps precisely with the storm drain easement granted in 1956.

We now explain a phrase the parties use: "first out." Following their usage, we refer to the deeds granting the

subdivided parcels to new owners for the first time as *first out grant deeds*.

In June 1957, Rollingwood issued the *first out grant deed* for Lot 24, or 5250 Willow Wood Road, to Robert Byron Bodoh and Evelyn E. Bodoh.  This deed included the following description: "an easement . . . together with the right of entry thereon for slope maintenance purposes only."  The area covered by the easement overlapped with part of the land described in Rider 1 to the 1956 easement, or the storm drain easement.  Lot 24 passed through a number of owners and eventually, in 2010, Schill bought it.  The grant deed conveying Lot 24 to Schill contains the same easement language as the Bodoh grant deed.

The Pereras' lot likewise went through a series of owners.  Abdul A. Khakwani took possession in 2005.  Khakwani wanted to build a residence on the property.  He sought a certificate of compliance from Rancho Palos Verdes to allow him to do so.  The City told him the property did not have ingress and egress access, and the City had no obligation to provide it.  Rolling Hills Estates sent Rancho Palos Verdes a letter urging the City to deny the request because of the area's importance as a natural drainage course and citing geological concerns with regards to existing residences in both cities.  Rancho Palos Verdes also advised Khakwani he would need to provide authorization from easement holders to build within the easements.  After several years of opposition from neighbors and unsuccessful efforts to obtain access and development approval, Khakwani offered to sell the property to the City for $1.625 million.  In 2013, Khakwani conveyed the property to himself and Anita Azis Khakwani.  The Khakwanis then conveyed the property to the Pereras the same day for $500,000.

4

The Pereras also sought to build a residence on the property and submitted an application for a 10,832 square foot structure, requesting the access restrictions be rescinded. Their plan included a driveway that was partially within the boundaries of the 1956 and 1957 easements. Rancho Palos Verdes informed the Pereras it would consider the application in two phases: first it would consider whether access should be granted, and if granted, then the City would consider the rest of the application.

Neighbors, including Schill, once again opposed the proposed development. In September 2016, the City decided the application had to be considered as a whole, contrary to its initial position. In October 2017, the City told the parties they needed to resolve the easement issues themselves. The City told Schill and the Pereras that it could not adjudicate their respective rights. The City announced it would be able to rely on a judicial determination of these rights.

Schill filed this lawsuit, asking the court to declare that he and the other lot owners were successors to the 1956 and 1957 easements.

After extensive briefing and a three-day bench trial, the court issued a 43-page ruling rejecting Schill's claim. The court held Schill's easement was limited to the description in the grant deed to Lot 24. Schill appealed.

II

Schill unsuccessfully attacks the trial court's ruling.

A

We begin with some basics. An easement is a right to do something, or keep something from happening, on another's property. (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24

Cal.4th 871, 880–881.)  The property that benefits from the easement is called the dominant tenement, and the property obligated by the easement is called the servient tenement.  (*Id.* at p. 881.)  An easement is appurtenant when it is attached to the land and passes with ownership of the land.  (*Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 568–569.)

Civil Code section 807 provides:  "In case of partition of the dominant tenement the burden must be apportioned according to the division of the dominant tenement, but not in such a way as to increase the burden upon the servient tenement."

Similarly, the Restatement  of Property, section 488 provides: "Except as limited by the terms of its transfer, or by the manner or terms of the creation of the easement appurtenant, those who succeed to the possession of each of the parts into which a dominant tenement may be subdivided thereby succeed to the privileges of use of the servient tenement authorized by the easement."

Illustration 1 to comment a to this section explicitly recognizes the right of a subdivider to apportion the benefits of an easement to some parts of the property and abandon it as to others: "A is the owner and possessor of Blackacre consisting of Lots 1 and 2.  B, the owner and possessor of Whiteacre, adjoining land, conveys to A a right of way over Whiteacre to be used as a means of access to and from Blackacre. A conveys Lot 1 to C, together with a right of way over Whiteacre.  He conveys Lot 2 to D, expressly excepting the use of the way over Whiteacre, his intention being to extinguish the easement as to Lot 2.  C is entitled to use the way as an appurtenance of Lot 1; D is not entitled to use the way as an appurtenance of Lot 2."
(*Id.* at § 488, com. 1, illus. 1.)

This concept is also incorporated in comment b to section 5.7 of the Restatement Third of Property (Servitudes), which states: "Apportionment by subdivider or other owner. Although appurtenant benefits cannot generally be severed and conveyed separately from the benefited property (see § 5.6), they can be apportioned by the owner of the property to some parts of the property and abandoned as to other parts of the property. If this is done prior to or at the time of subdivision, the apportionment is effective to determine which parcels receive the benefits."

Courts construe easements as contracts. (*Continental Baking Co. v. Katz* (1968) 68 Cal. 2d 512, 521.) Consistent with this approach, we may consider extrinsic evidence to explain, but not change, the terms of the grant. (*Buehler v. Oregon-Washington Plywood Corp.* (1976) 17 Cal. 3d 520, 526.) Where there are no factual disputes, we review the trial court's conclusion independently. (*Cal. Retail Portfolio Fund GMBH & Co. KG v. Hopkins Real Estate Group* (2011) 193 Cal.App.4th 849, 855.)

B

Schill loses because Rollingwood drafted the easements in the first out grant deeds with careful and sensible language that contradicts Schill's position.

We start with the words of the contracts at issue: the easements. The 1956 easement describes an area about 250 feet long encumbered for storm drain purposes and an area about 850 feet long encumbered for slope purposes. The 1957 easement describes the same 250 feet long portion of the property described in the 1956 easement for storm drain purposes and encumbers it for slope purposes as well. The land covered by the 1956 storm drain easement and 1957 slope easement borders Lot 24. The

7

deed for Lot 24 describes an easement over an area directly behind the property and generally the width of Lot 24. This easement area described in the Lot 24 deed overlaps with part of the area described in Rider One in the 1956 corporate grant deed and in the 1957 corporate grant deed. Each of the first out grant deeds for the lots of the subdivision Rollingwood conveyed similarly describe an easement over the area directly behind the property described in the deed. These easements overlap with portions of the 1956 or 1957 easements or both.

These circumstances show that Rollingwood meant the easements in the first out grant deeds to modify the 1956 and 1957 easements. First, the descriptions of the easements in the first out grant deeds postdate the descriptions in the 1956 and 1957 easement grants. Thus, Rollingwood was aware it could have simply passed the existent easements on through the new grant deeds. As the trial court noted, Rollingwood's reference to the instruments establishing the 1956 and 1957 easements to describe the new easements show it had those older easements in mind when determining what easement to provide in the first out grant deeds. And despite having in mind the larger geographical swath and scope of purpose of the 1956 and 1957 easements, Rollingwood included in the first out grant deeds descriptions specifically contracting the easement in both size and scope, to a smaller geographical area and only slope maintenance purposes, a distinct contraction from slope construction and slope maintenance purposes, together with the right of entry for such purposes, and storm drain purposes described in the 1956 and 1957 easements.

Had Rollingwood intended to convey more, it would not have taken this extra effort to describe less. We construe the

8

contract to effectuate what Rollingwood said it was giving.  There is no warrant for giving more.

Thus the language of the easements confirms Rollingwood intended to modify the 1956 and 1957 easements in the lot grant deeds.

It makes sense that Rollingwood would have behaved this way.  Giving more extensive easements to lot buyers predictably could lead to future mischief and neighborhood conflict, if each buyer sought to control matters beyond property borders.  Here, for instance, Schill seeks to block a driveway some 500 feet away from his land.  The deeds create no homeowners association or other similar mechanism of collective governance for the area. Schill's proposed reading of the easements is a recipe for neighborhood litigation, given that every lot owner may have a different neighborhood vision.

C

Schill makes several meritless arguments to avoid this result.

1

First, Schill argues the trial court applied the wrong standard in determining if the easements had been modified.  Schill claims a court can find an easement has been modified only where there is "clear and unequivocal evidence" that the holder meant to modify it.  As the trial court and respondents point out, Schill provides no authority for this claim.  The cases Schill cites instead discuss the standard courts apply when ascertaining whether an easement has been abandoned through nonuse.  (See, e.g., *Visitacion Investment, LLC v. 424 Jessie Historic Properties, LLC* (2023) 92 Cal.App.5th

1081, 1090.)  Courts construe easements as they would any contract.  The trial court applied the correct analysis.

Schill argues the easements in the first out grant deeds are simply duplicative of the easements in the corporate grant deeds, covering some of the same ground.  He responds to the trial court's dismissal of this argument by citing examples where courts have acknowledged the existence of overlapping easements.  Easements can overlap, but here they do not.  In Schill's examples, the easements were for different purposes or were held by different entities.  (See *Friends of Hastain Trail v. Coldwater Development LLC* (2016) 1 Cal.App.5th 1013, 1033 [mentioning overlapping easements held by the Nevada Irrigation District and the public]; *Grand Canyon West Ranch, LLC v. Scarlett* (D. Ariz. Sept. 1, 2006) 2006 WL 8440586, at *1 [easement granted to County of Mohave through deed of dedication overlapped in part with easement to Bureau of Land Management].)  Schill cites no example of two easements held by the same entity for the same purpose, which is what he claims we should find exists here.  These circumstances compel the opposite conclusion:  Rollingwood did not intend the easements in the first out grant deeds to create an overlapping easement with the 1956 and 1957 corporate grant deed easements.

Schill points to Attica's express abandonment of its ingress and egress easements to Silver Spur Road and Hawthorne Boulevard.  He argues that Rollingwood's failure to do something similar with regard to the slope and storm drainage easements shows it did not intend to abandon them.  Schill overlooks a critical difference:  Attica intended entirely to abandon the ingress and egress easements, but Rollingwood intended only to modify the 1956 and 1957 easements.  It was logical the two

10

entities used different methods to achieve different ends. Schill's first argument fails.

2

Second, Schill asserts the trial court was wrong to find Civil Code section 807 required apportioning the easement here. As laid out above, section 807 states that, where the benefited property is subdivided, the burden should be apportioned, but not in a manner that will increase the burden on the obligated property. Schill argues that, because subdividing Rollingwood's property did not increase the burden on the obligated property, the benefit did not need to be apportioned. This argument misses the point. The court did not find that section 807 mandated in general that easements be split up. Rather, the fact that section 807 contemplates that an easement may be apportioned upon a subdivision of the dominant tenement supports the interpretation that that is what Rollingwood did here. Schill's argument that a "slope easement is a different class than other types of easements. . . and cannot be reasonably isolated to a single space" is not well taken. While a wider slope easement can provide more protection, there are many practical reasons why it would be limited, as discussed above, and we look to the words of the easement grant to determine the intention of the easement holder. Here, as we have detailed, the language used shows Rollingwood intended to convey only particular pieces of the easement to each lot.

3

Third, Schill argues the trial court erred by applying comment b to section 5.7 to the Restatement Third of Property (Servitudes).

11

Recall comment b notes that, when a subdivider apportions a benefit "at the time of subdivision," that apportionment is generally effective. (Rest.3d Property (Servitudes), § 5.7, com. b.) Schill contends that, because Rollingwood acquired the property after it had been subdivided and thus did not apportion the easement at the same time it was subdivided, comment b cannot apply. Schill maintains "the time of subdivision" means when a subdivision or tract map created the lots. Schill is correct that the subdivided lots do come into existence at that point. (See *Gardner v. County of Sonoma* (2003) 29 Cal. 4th 990, 1002 ["a modern-day final map or parcel map, which upon recordation ordinarily converts what was formerly a single parcel into as many separate lots as appear on the map"].) But that is not the only relevant time frame for the considerations in section 5.7 of the Restatement. Schill does not offer authority or reasoning to support his interpretation. Nor does he provide authority that such a map must and would always reflect such considerations.

We need not establish the exact contours of "at the time of subdivision" here. We simply hold that conveyance of the first out grant deeds falls within this definition.

Schill further asserts that the trial court misinterpreted subsection (1) of section 5.7, which, in discussing the subdivision of benefited and burdened property, states: "Each separately owned parcel is entitled to make the uses privileged by an easement or profit; provided, however, that if apportionment is required to avoid an unreasonable increase in the burden on the servient estate, the use rights are appropriately apportioned among the parcels." (Rest.3d Property (Servitudes), § 5.7, subd. (1).) Schill again claims the trial court erred by finding that the benefit must be apportioned even though there was not an

12

unreasonable increase in the burden on the Pereras' property. He is again mistaken that this was the court's reasoning. Section 5.7 makes clear that subdividing a benefited or burdened property does not generally affect the benefit or burden, "unless the terms of the servitude provide otherwise." As detailed above, here the terms of the easement did provide otherwise. That is the basis for the trial court's reasoning. Schill's contrary assertion is in error.

D

The trial court properly denied Schill's request for injunctive relief. It rightly found Schill had no right to the easements described in the 1956 and 1957 corporate grant deeds, and also had failed to present evidence of proposed development that would interfere with such rights even if he had them.

E

We deny Schill's request for judicial notice as irrelevant.

**DISPOSITION**

We affirm the judgment and award costs to the Pereras.


WILEY, J.

We concur:


STRATTON, P. J.



VIRAMONTES, J.


13